# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-00610-SCT

*LYNDON C. MYERS a/k/a LYNDON MYERS a/k/a*
*LYNDON CHARLES MYERS a/k/a LYNDON C.*
*MYERS, III*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/11/2013 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| TRIAL COURT ATTORNEYS: | JACOB M. RITCHEY |
| | MICHAEL GUEST |
| | BRYAN P. BUCKLEY |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | J. M. RITCHEY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/04/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Lyndon Myers was charged and convicted on multiple counts of armed robbery, *inter alia*. *See infra* ¶¶ 6, 9. Myers claims error on five issues. Finding no error, we affirm Myers's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2.     Myers was employed at the Dollar Tree store located in the Grandview shopping center, Madison, Mississippi. On May16, 2012, Myers was scheduled to work until closing at 10:00 p.m. However, according to the assistant manager Jasmine Wilson, Myers asked her "three or four times" if he could "leave at 9:00 because his baby's mother was coming . . . to pick him up from work, and that if he wasn't out there, that she was going to leave . . . ." Wilson had Myers "sit in . . . and verify the money with [her] . . . . [O]nce [she] finished the bank deposit for that part of the night, [she] let him clock out and go home" at 9:00 p.m.

¶3.     Later that night, Chamon Williams, Myers's co-employee, exited the Dollar Tree. Upon exiting, Williams was confronted by Earnest Johnson, Myers's cousin. Johnson displayed a gun and told Williams to "give him the money." Williams told Johnson that she had no money. Another Dollar Tree employee opened the store door to check on Williams. Johnson then took Williams's cell phone and forced her back into the store with him.

¶4.     Johnson went straight to the manager's office. Johnson pointed the gun at the window of the office "and t[old] [her] to open the door" or "he was going to hurt [her] employees." Wilson opened the office door. Johnson entered and told Wilson "to open the safe up and to get the petty cash out."[1] Wilson complied. Johnson had Williams place the money in a Dollar

---

[1]State: "When he asked you for the petty cash, did that mean anything to you?"
Wilson: "Yes . . . that means that somebody had told him exactly what to get."
State: "Did you all refer to it as petty cash?"
Wilson: "Yes."
State: "Did you ever just call it money or did you call it petty cash?"
Wilson: "No, its specifically called petty cash."

Tree bag. He then took Wilson's cell phone, and, after threatening to kill anyone who tried to leave the store, Johnson exited.

¶5. Johnson was picked up by "a red Grand Am" traveling "at a fast rate of speed[.]" Subsequently, after receiving a "be on the lookout[,]" a Madison County sheriff's deputy stopped a red Grand Am traveling north on Interstate 55 near the Nissan plant. Myers was driving. When the deputy stopped the vehicle, "before [he] exited, both subjects put their hands on the roof of the car." After Myers and Johnson were removed from the vehicle, the vehicle was searched and the stolen money and a gun were found in a Dollar Tree bag located in the trunk of the red Grand Am. Myers's coemployees testified that Myers drove a red Grand Am.

¶6. In July 2012, Myers and Johnson were coindicted for three counts of armed robbery, one count of conspiracy to commit armed robbery, and one count of possession of burglary tools.[2] Myers additionally was indicted for possession of a firearm by a prior convicted felon.

¶7. Myers's trial began on November 13, 2012. Johnson testified at Myers's trial.[3] Johnson testified that it was Myers's idea to rob the Dollar Tree. They formulated the plan approximately three weeks before the robbery. Johnson testified that, after Myers left work that night, Myers and his wife picked up Johnson and went to their house. Myers "gave

[2]The charge for possession of burglary tools was dismissed at trial.

[3]Johnson had pleaded guilty to simple robbery on November 5, 2012. At the time of Myers's trial, Johnson had not been sentenced, but his plea recommendation was that he "receive forty years . . . with twenty five years to serve."

3

[Johnson] a black shirt, and he brought the gun back out and put it in the trunk." Myers then drove Johnson to Madison and "dropp[ed] [him] off across the street" from the Dollar Tree. Myers told Johnson that the remaining employees "were supposed to [leave] at 11:00" and told him where the safe was located in the store. Johnson's description of the robbery was consistent with Wilson's and Williams's testimony.

¶8.     Following the armed robbery, Johnson exited the store and proceeded to where Myers was supposed to pick him up, but Myers was not there.[4] Johnson called Myers, who told him, "[c]uz, I'm on my way." Myers arrived momentarily traveling "fast." Johnson got in the red Grand Am, and the two sped out of the parking lot and "got on the interstate." Johnson "threw the [stolen] phones" and "the black shirt" out of the window. After traveling a few miles north on the interstate, Myers pulled over and "put the money and gun in the trunk[,]" because "he [had] license and insurance . . . . [I]f they were pulled over they [(the police)] won't search the car . . . ."

¶9.     The jury convicted Myers of three counts of armed robbery, conspiracy to commit armed robbery, and possession of a firearm by a prior convicted felon. The trial court later sentenced Myers to thirty-five years on each of the armed-robbery counts, and to five years for conspiracy to commit armed robbery. The trial court ordered that those sentences be served concurrently. The trial court also sentenced Myers to ten years for felon in possession

---

[4]State: "Did he explain to you in any way – if he is supposed to be waiting for you and he is not there . . . did he explain why he didn't follow the plan?"
     Johnson: "No, sir. I just thought he was going for an alibi."

4

of a firearm, but, after "serv[ing] a term of One (1) days(s) in the custody of the MDOC, [Myers] shall be released" and "serve a term of five (5) years(s) on supervised post-release supervision." The trial court ordered that sentence to be served consecutively to the sentences imposed for armed robbery and conspiracy to commit armed robbery. Myers also was ordered to pay "court costs, fees and assessments in the amount of one thousand, six hundred, two dollars and fifty cents . . . within ninety days [of] release from custody."

¶10.    Within weeks of Myers's trial, Johnson handwrote a third and fourth letter [5] (signed affidavit) recanting the sworn testimony he offered at his plea hearing[6] and Myers's trial. Subsequently, Myers filed a "Motion for Judgment Notwithstanding the Verdict, or, in the alternative, Motion for New Trial." Attached to that motion were Johnson's most recent letters. The trial court conducted a hearing on Myers's motion, and Johnson testified. Finding Johnson's recantation lacked credibility, the trial court denied Myers's motion. Thereafter, Myers filed a "Notice of Appeal."

## ISSUES

¶11.    On appeal, Myers raises the following issues, restated as follow:

I.      Whether the trial court erred in denying Myers's alibi instruction.
II.     Whether the trial court erred in denying Myers's necessity instruction.
III.    Whether the trial court erred in allowing the State to question Myers regarding his prior felony conviction.

---

[5]Johnson and Myers exchanged other letters prior to trial, in which Myers asked Johnson not to "tell on me[,]" and Johnson disclaimed Myers's involvement. Their letters will be discussed *infra* in Issue IV.

[6]*See supra* n.3.

IV.     Whether the trial court erred by denying Myers's motion for a new trial.

V.      Whether the trial court sentenced Myers to a term in excess of his present life expectancy.

## ANALYSIS

### I.    Whether the trial court erred in denying Myers's alibi instruction.

¶12.    This Court reviews the grant or denial of jury instructions for abuse of discretion. *Watkins v. State*, 101 So. 3d 628, 633 (Miss. 2012). A defendant is entitled to have the jury instructed on his "theory of the case – so long as that theory constitutes a legal defense to the charged offense, is not repetitious, and is supported by the evidence." *Flowers v. State*, 51 So. 3d 911, 913-14 (Miss. 2010).

¶13.    Prior to trial, Myers filed a "Written Notice of Alibi Defense" pursuant to Uniform Rule of Circuit and County Court 9.05. *See* URCCC 9.05. That notice stated, "[a]t the time of the robbery . . . defendant claims to have been shopping at the Wal-Mart Store . . . ." The notice also provided that Myers had "subpoenaed the security video recordings from the Wal-Mart store . . . ." Those recordings were entered into evidence at trial and revealed that Myers was at Wal-Mart while Johnson was robbing Myers's fellow employees at the nearby Dollar Tree.

¶14.    At trial, Myers requested jury instruction D-2, which read as follows:

Alibi means elsewhere or in another place. In this case the defendant is asserting the defense of alibi by saying that he was at Wal-Mart Store at the time of the armed robbery and that his vehicle, which was parked in the Wal-Mart parking lot, was running hot and he was working to repair his vehicle and going in and out of Wal-Mart to obtain water and a flashlight for his vehicle up until the time that Earnest Johnson commenced the armed robbery of the Dollar Tree Store #2730.

6

Alibi is a legal and proper defense in law. The defendant is not required to establish the truth of his alibi to your satisfaction, but if the evidence in this case raises in the minds of the jury a reasonable doubt as to whether the defendant was present and committed the crime, then you must give him the benefit of the doubt and acquit him.

¶15. This Court has stated that "in cases where a defendant interposes the defense of alibi, and presents testimony in support of such a defense, the defense is entitled to a jury instruction focusing upon such a theory." *Morris v. State*, 777 So. 2d 16, 29 (Miss. 2000) (quoting *Young v. State*, 451 So. 2d 208, 210 (Miss. 1984)). However, "[w]here proof does not support an alibi defense, the instruction should not be granted." *Cochran v. State*, 913 So. 2d 371, 375 (Miss. Ct. App. 2005).

¶16. Myers's presence "at Wal-Mart Store at the time of the armed robbery" did not establish an alibi defense as to the State's charges against him. In response to D-2, the State submitted that "alibi is inapplicable to the facts in this case since the defendant is not charged and the State doesn't contend he was physically present [or] directly participat[ed] in the crime." Throughout trial, the State presented proof that Myers conspired with Johnson to commit armed robbery, actually devised the plan, gave Johnson inside information about the store that he knew as a result of being employed there, provided him with the gun, drove him to the store, and drove the getaway in a car that matched the car Myers regularly drove to and from work. The evidence established that Myers was at Wal-Mart when Johnson robbed the Dollar Tree, located in a building in the same shopping center as Wal-Mart. But, Myers's physical location at the moment of the robbery "d[oes] not constitute a legal defense" to the

7

offenses for which Myers was prosecuted. Thus, the trial court did not abuse its discretion in denying D-2.

> **II. Whether the trial court erred in denying Myers's necessity instruction.**

¶17. The State adduced testimony that Myers's fingerprint was on the gun which the arresting officers seized from the trunk of the red Grand Am Myers was driving. To explain the presence of his fingerprint, Myers testified that, "four to five days" prior to the robbery, he and his three-year-old son had gone to Johnson's house. Johnson "had the firearm laying on the coffee table[,]" so, for his son's safety, Myers claimed to have "grabbed the gun and told [Johnson] to put it up." Thus, Myers claimed that his fingerprint on the gun was from necessity, but Myers offered no testimony as to necessity of possession of the gun found in a Dollar Tree bag with the stolen money in the trunk of the car he was driving shortly after the armed robbery of May 16.[7]

¶18. Myers requested jury instruction D-11, which read as follows:

> The Court instructs the jury that necessity is a valid, legal defense to the crime of possession of a firearm by a convicted felon. In order to be entitled to the defense of necessity, the defendant must prove or establish to your satisfaction each of the following: (1) that his possession of the firearm was done to prevent a significant injury; (2) there was no adequate alternative to his possession of the firearm; and (3) the harm, if any, caused by his possession of the firearm was not disproportionate to the harm avoided.

---

[7]The jury was instructed, in pertinent part, that "[c]onstructive possession may be shown by evidence, which if believed by the jury, establishes that the said Taurus 9 mm pistol was subject to the defendant's dominion and control."

¶19.    Necessity is a recognized legal defense in this State,[8] but, like Myers's argument regarding alibi, that defense is not applicable to this case. The evidence which he claims supports the instruction – his testimony that he possessed the gun "four to five days" prior to the robbery out of necessity – does not "constitute[] a legal defense to the charged offense[.]" *Flowers*, 51 So. 3d at 913-14. He was not prosecuted for possession of the gun on May 11 or May 12, just as he was not prosecuted for an armed robbery on May 11 or May 12. Myers's admission that he handled the gun prior to the robbery, even if believed, does not alter the fact that, when he was arrested on May 16, the gun was in his possession. Myers's testimony served as an explanation for the presence of his fingerprint on the gun, but it does not acquit him from the charge of possession of the gun at the time of his arrest. The jury was free to accept or reject Myers's testimony, but that explanation did not support a necessity defense to the crime for which he was prosecuted. Myers offered no testimony that the gun was placed in the trunk out of necessity.

¶20.    Myers was found in possession of the gun long after any claimed necessity had passed. A defendant is not entitled to a necessity defense when he or she pursues a continued

---

[8] *See* **Knight v. State**, 601 So. 2d 403 (Miss. 1992).

course of criminal conduct after circumstances justifying such conduct cease to exist.[9]

Therefore, the trial court did not abuse its discretion in denying D-11.

### III. Whether the trial court erred in allowing the State to question Myers regarding his prior felony conviction.

¶21. "The circuit court's decision to admit the prior conviction for impeachment is reviewed under an abuse-of-discretion standard." **Strickland v. State**, 980 So. 2d 908, 919 (Miss. 2008) (citing **Henderson v. State**, 641 So. 2d 1184, 1186 (Miss. 1994)).

¶22. In October 2007, Myers was convicted for the sale of drugs in the Circuit Court of Madison County. For purposes of his present charge for possession of a firearm by a prior convicted felon, Myers stipulated to his prior felony conviction, which was admitted by agreement.

¶23. During its case-in-chief, the State did not delve into the nature of Myers's previous conviction. Myers elected to testify in his defense. Prior to his taking the stand, the State "ask[ed] that the [c]ourt take up the matter of allowing [it] to question [Myers] as to his prior

---

[9]In **U.S. v. Panter**, 688 F. 2d 268, 270-271 (5th Cir. 1982), the United States Court of Appeals for the Fifth Circuit stated:

> On three previous occasions, we have been urged to address the question whether the existence of exigent circumstances or an emergency is a defense to a firearms possession charge. **United States v. Scales**, 599 F. 2d 78 (5th Cir. 1979); **United States v. Hammons**, 566 F.2d 1301 (5th Cir.), *vacated and remanded on other grounds*, 439 U.S. 810, 99 S. Ct. 68, 58 L. Ed. 2d 102 (1978); **United States v. Parker**, 566 F.2d 1304 (5th Cir.), *cert. denied*, 435 U.S. 956, 98 S. Ct. 1589, 55 L. Ed. 2d 808 (1978). In each case, we found it unnecessary to decide the issue because the defendant kept the gun beyond the time of the emergency that allegedly justified his possession.

felony conviction." The State argued that the prior conviction would be "used to impeach [Myers's] testimony . . . ." Myers's counsel argued, "we don't have any objection to the State calling again to the jury's attention that he is a convicted felon . . . [but] the crime itself and when it happened, those particulars would be more prejudicial than probative." Thus, the issue is not whether Myers's prior conviction was admissible, for it already had been admitted. The issue is limited to whether the State could question Myers on his prior conviction.

¶24. The admission of prior convictions for impeachment purposes is guided by Mississippi Rule of Evidence 609(a)(1) which provides, in pertinent part,

> (a) General Rule. For the purpose of attacking the character for truthfulness of a witness,
>
> (1) evidence that (A) a nonparty witness has been convicted of a crime shall be admitted subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and (B) a party has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the party[.]

Miss. R. Evid. 609(a). The comments to Rule 609 provide that "convictions offered under 609(a)(1) to impeach a party must be analyzed under the guidelines set forth in ***Peterson*** [***v. State***, 518 So. 2d 532 (Miss. 1987)] . . . to determine if the probative value is great enough to overcome the presumed prejudicial effect to that party, and findings should be made on the record by the judge." Miss. R. Evid. 609 cmt. Although noting that "the relevant considerations will vary to the particular facts of each case," the ***Peterson*** court provided a "specific list of factors to be considered by the trial judge[:]"

11

(1) The impeachment value of the prior crime.

(2) The point in time of the conviction and the witness's subsequent history.

(3) The similarity between the past crime and the charged crime.

(4) The importance of the defendant's testimony.

(5) The centrality of the credibility issue.

*Peterson*, 518 So. 2d at 636 (quoting 3 J. Weinstein, *Evidence* 609, 688-89 (1987)).

¶25.    Consistent with this Court's decision in ***Peterson*** and Rule 609(a)(1), the trial court conducted a hearing regarding whether the State could question Myers about his prior felony conviction and made on-the-record findings. The trial court found that the impeachment value of the prior crime, *vel non*, and the importance of the defendant's testimony weighed against admissibility. However, because the prior conviction was relatively recent and wholly dissimilar from the present charged crime, the trial court concluded that the remaining three factors weighed in favor of admissibility.[10] Ultimately, the trial court stated "that the probative value of the State being allowed to elicit from the defendant the nature and the date of his conviction outweighs the prejudicial effect." The trial court "allowed [the State] to inquire as to the nature and the date of the conviction[,]" but *sua sponte* proposed that the jury receive a limiting instruction that Myers's prior conviction was "only [to be]

---

[10]*See **Peterson***, 518 So. 2d at 637 ("The past crime, possession of marijuana with intent to deliver, is so similar to the crime for which Peterson was being tried, sale of marijuana, that the prejudicial effect of the conviction is very high.")

12

consider[ed] for the purpose of attacking the defendant's character for truthfulness."[11] As can be seen *infra*, the State followed the instruction of the trial court and limited its questions "to the nature and the date of the conviction."

¶26. The trial court conducted a full, on-the-record ***Peterson*** analysis. Based on the record before this Court, we cannot conclude that the trial court abused its discretion by permitting the State to question Myers about his prior felony conviction.

¶27. Furthermore, Myers opened the door to the State to impeach his testimony by asking about his prior conviction. The trial court made its determination that Myers's prior conviction had little impeachment value after Myers elected to testify but prior to Myers taking the stand. Myers proceeded to testify that Johnson was troubled, addicted to alcohol and drugs, and "a bad crowd within himself." Myers then portrayed himself as someone who others thought could help Johnson and claimed that he had tried to help Johnson by "giving him good advice about things."

¶28. To contest Myers's testimony that he was a mentor to Johnson, the State questioned Myers regarding his prior conviction.

> Q: "And is he [(Johnson)] a drug addict?"
> Myers: "Yes, sir."
> Q: "And you are a convicted drug dealer?"
> Myers: "Yes, sir."
> Q: "And you thought it would be a good idea to mentor Earnest Johnson? Yes or no?"

[11]The jury was instructed, in pertinent part, "you are not to consider the defendant's prior conviction . . . as evidence of his guilt of the crime(s) for which he is now on trial, but you may consider that conviction only as it may bear on his character for truthfulness."

Myers: "Yes, sir."

. . . .

Q: "When were you convicted of selling drugs?

Myers: "[I]t was 2007."

¶29. In attempting to paint himself as a mentor to Johnson, who was addicted to alcohol and drugs, Myers opened the door for the State to attack his credibility by questioning him about his prior conviction for the sale of drugs. *See Bush v. State*, 895 So. 2d 836, 848-49 (Miss. 2005) ("By voluntarily indulging in the tactic of presenting himself as man who is afraid of 'guns, knives, or anything of that nature,' Bush extended a conditional invitation to the State for impeachment by way of his prior convictions[]" for "robbing a boy of his jacket, armed robbery, and armed kidnaping.") As a result of Myers's testimony, the nature and date of his prior conviction were probative of his credibility.

**IV. Whether the trial court erred by denying Myers's motion for a new trial.**

¶30. The decision to grant or deny a new trial based on recanted testimony "is left to the sound discretion of the trial court free from interference except for abuse of such discretion." *Bradley v. State*, 214 So. 2d 815, 817 (Miss. 1968). "[R]ecanting testimony is exceedingly unreliable, and is regarded with suspicion; and it is the right and duty of the court to deny a new trial where it is not satisfied that such testimony is true." *Id*. The trial court's "determination . . . should not be set aside unless clearly erroneous." *Riddle v. State*, 413 So. 2d 737, 740 (Miss. 1982) (quoting *Peeples v. State*, 218 So. 2d 436, 438-39 (Miss. 1969)).

14

¶31.	Before Myers's trial, on October 24, 2012, Johnson penned two letters. The first was signed by Johnson. The second letter was signed by Johnson and notarized.[12] Both letters disclaimed Myers's involvement in the armed robbery. Johnson wrote that, when he exited the Dollar Tree, he called Myers for a ride and, "by him been [sic] my cuzin [sic][,] he gave me a ride[,]" without knowledge that Johnson just had committed armed robbery.

¶32.	On November 5, 2012, Johnson pleaded guilty to three counts of simple robbery.[13] During his plea colloquy, Johnson testified under oath that no promises or hope of reward had been made in return for his guilty plea. He further testified that the robbery was Myers's idea, Myers had given him the gun, and Myers had driven him to and from the robbery. Since he and Myers had been arrested, Myers had spoken to him and "tried to get [Johnson] to hold up for it . . . . Say I did everything and set him free."

¶33.	Johnson's testimony at Myers's trial was consistent with his testimony at his November 5 plea hearing. During Myers's trial, the State revealed the letters Johnson had written on October 24 and questioned Johnson about the letters before the jury. At trial, Johnson testified that Myers had asked him to write the letters, but they were not true. According to Johnson, he wrote them "because [Myers] told [him] he's going to put some money on [his] book and look out for [him] while [he] was locked up." Johnson further testified that Myers had made other attempts to get him to say that he (Myers) was not

---

[12]Johnson's second letter was notarized by Myers's defense counsel.

[13]The transcript of Johnson's plea hearing was entered into evidence as Exhibit S-1 at Myers's post-trial hearing.

involved in the robbery. Thus, the jury received and considered exculpatory letters before convicting Myers.

¶34. After Myers's conviction, Johnson penned two more letters (one a signed affidavit) recanting his testimony at his plea hearing and at Myers's trial. He claimed that Myers had not participated in the robbery, a version rejected by the jury at Myers's trial. Johnson's affidavit stated that the "D.A. promised [him] 25 years . . . if [he] testified against . . . Myers," and "he didn't want to be in prison for the rest of [his] life so [he] did it."

¶35. On January 17, 2013, Myers filed a "Motion for Judgment Notwithstanding the Verdict, or, in the alternative, For a New Trial[,]" and attached Johnson's affidavit recanting his trial testimony as "Exhibit A." The trial court conducted a hearing on Myers's motion. At that hearing, Johnson testified that Myers was not involved in the robbery and provided an expanded exculpatory version of the May 16 armed robbery. The trial court found that Johnson's post-trial version lacked credibility and denied his motion.

¶36. On appeal, Myers argues that he is entitled to a new trial because the "jury never got the opportunity to hear Johnson's recantation of his trial testimony." While Myers is correct that the jury did not hear Johnson's post-trial recantation, his argument characterizes Johnson's post-trial testimony as something new. The subject of Johnson's post-trial letters and testimony was explored at trial, before the jury. Johnson was questioned by the State on direct examination and extensively cross-examined by the defense about the pretrial,

exculpatory letters. Thus, Johnson's inculpatory and exculpatory versions regarding Myers's participation, *vel non*, were squarely before the jury.[14]

¶37.    In *Gathings v. State*, 46 So. 2d 800 (Miss. 1950), following Gathings's trial, all three alleged accomplices recanted their trial testimony and disclaimed Gathings's involvement. The Court reversed Gathings's conviction based on the recanted testimony. *Gathings*'s reasoning explains its distinction from the facts of today's case. The *Gathings* Court opined:

> Thus it will be seen that we do not have a case where State witnesses have told one story on direct examination and an entirely different story on cross examination, and *where the jury was afforded the opportunity of determining which story, if either, was the truth*, but rather a case where the defendant as convicted by *the jury* on the testimony of witnesses who were then unimpeached and *did not have the benefit of their subsequent repudiation of the original story told by them*.

*Id*. (Emphasis added.) In the case *sub judice*, the jury was "afforded the opportunity of determining which [of Johnson's] stor[ies], if either, was the truth[.]" *Id*. Unlike *Gathings*, Johnson was examined at trial on his inculpatory and exculpatory versions, giving the jury "the benefit" of considering Johnson's inconsistent testimony. *Id*. In *Gathings*, no jury passed upon the inconsistent versions.

¶38.    In *Gathings*, the "only proof . . . that tended in any manner to implicate . . . Gathings" was that of the "three alleged accomplices." *Id*. at 801. In the case *sub judice*, the jury heard

---

[14] The jury was instructed that "the law looks with suspicion and distrust upon the testimony of an accomplice . . . . [Y]ou must first view his testimony with suspicion and distrust, and then, after having exercised the utmost care and caution with respect to his testimony, you must determine whether or not you believe beyond a reasonable doubt that Earnest Johnson's testimony is true."

17

the testimony of Jesmane Young. Young, a lifelong acquaintance of Myers, was incarcerated with Myers. Young testified that Myers told him that "he [(Myers)] was the one who set the robbery up." Myers told Young that he had gone "to Walmart . . . to buy some dog food and to get some water to put in the car just to throw everybody off at the Dollar Tree . . . as Earnest [(Johnson)] do [sic] the robbery." Myers told Young that, when he and Johnson left the Dollar Tree, "he stopped and pulled over and opened the trunk and put the stuff in the trunk, the money and the gun . . . ." Myers further told Young that he was going to try and get Johnson to take the fall and in return would put money on Johnson's "books . . . commissary account" in prison. Young's testimony corroborated Johnson's version of the events sworn to at both his plea hearing and Myers's trial. The trial court instructed the jury that Young's testimony should be considered with caution, despite Young's testimony that there had been no promises of favorable treatment in exchange for his testimony.[15] [16]

*Corrothers v. State* __ So. 3d __, No. 2012-DP-00208-SCT, WL2894310, **15-16 (June 26, 2014).

---

[15]The jury was instructed, in pertinent part, that "Jesmane Young . . . is an informant" and "that the law looks with suspicion and distrust upon the testimony of an informant. You should keep in mind that such informant testimony is always to be received and weighed with great caution. In determining what weight, if any, that you should give to the testimony of Jesmane Young, you must first view his testimony with suspicion and distrust, and you must exercise the utmost care and caution with respect to his testimony."

[16]During the jury instruction conference regarding the informant instruction, *supra* n.15, Myers's counsel stated, "Judge, they [(the jury)] can disbelieve every word out of [Johnson's] mouth and believe everything Jesmane Young said and convict [Myers]."

18

¶39. Finally, Johnson was not the only one to pen a letter in this case. While both were incarcerated, Myers wrote a two-page letter to Johnson, entered as State's Exhibit 37 at trial. Myers's letter read, in pertinent part:

> Ight [sic] let me break this down to you cuz in [sic] let this stick in your head no matter what goes on or a n**** saying over there. Bro (cuz) you went in the store by yourself with the gun and robbed them right "Right" okay I was in [W]almart right "Right" the folks in the store pointed you out the line up right "Right" not me right "Right" okay now watch this, but when they caught you we were together right "Right" okay they know you ran in the store and robbed the store they got you dead to the right cuz think about it, what is extra that I can tell them about you that they don't have already I can't tell them NOTHING lil cuz that's what I'm not understanding when you say hold up for everything. Lil cuz they don't have me doing nothing the only thing that would be left to do is that you tell on me that's what I'm trying to get you to see that what's scaring me my life is in your hand folk. Okay let me explain this to you "okay" the investigator come to you they going to ask you questions about me for you to sank [sic] me no matter what they say you still going to get the same amount of time the[y] probably [sic] ask you about how you get to the store, how you hear about the store no matter what they ask you what scares me is what you going to say *you tell them I had nothing to do with it and didn't know what[']s going on*, is it, *is all they need to know* . . . . [I]f you ain't got to sank [sic] me "don't" help me so *when I get out me [and] family show our respect for you by making sure you straight tooking [sic] care of . . . .*"

(Emphasis added.) Myers's letter corroborated Johnson's version of the events sworn to at his plea hearing and Myers's trial.

¶40. Regarding the credibility of Johnson's post-trial letters and subsequent testimony at the hearing on Myers's motion for a new trial, "we are reviewing a finding of ultimate fact, one made by a trial court sitting without a jury. We do not reverse such findings where they are supported by substantial credible evidence." *Yarborough v. State*, 514 So. 2d 1215, 1220 (Miss. 1987).

19

¶41. At the post-trial hearing, on direct examination, Johnson testified:

Me [(Johnson)] and my girl, we had got high, and we got in an argument at Applebee's 'cause we didn't have no more money. And I left Walmart, and then I had called her. I had told her, meet me at Walmart. She was still cursing me out. So I told her I'm going to have some money in a few minutes. And when I was at Walmart, I just looked, and I seen somebody in the front window of the store like they was fixing to come out. And I already had my gun, 'cause we was heading to Jackson, and I don't go to Jackson without no gun. So when I seen them coming out, I went up in there and robbed them.

¶42. On cross-examination, Johnson provided another version of how he ended up at Dollar Tree.

Well, when I left Applebee's, I walked across [the street]. And as I was coming down, it's a side street. As I was coming down the side street, and I seen people standing in the glass doorway, and a lady coming out, and that's when I ran to the thing.[17]

¶43. There is a striking inconsistency between Johnson's post-trial version on direct examination and that provided on cross-examination. In the version provided on direct examination, Johnson claimed that he saw someone in the window of the Dollar Tree from Walmart. On cross-examination, Johnson claimed to have seen someone inside the window of the Dollar Tree when he was coming down a side street, which is on the opposite side of Dollar Tree from Walmart.

---

[17]At Myers's trial, Johnson testified that he was sitting on a bench outside the store when he saw a Dollar Tree employee (Chamon Williams) exiting the store. His testimony was corroborated by Williams, who testified that, as she exited the store, Johnson was sitting on a bench. Neither of Johnson's post-trial versions account for this apparent conflict with both his trial testimony and that of Williams.

¶44.    Johnson then testified that, when he exited the Dollar Tree, he proceeded to his left, the opposite direction from Wal-Mart. Although walking away from Wal-Mart, Johnson claimed to have seen Myers walking out of the Wal-Mart store while he (Johnson) "was looking for somebody's car to steal." Then, Johnson testified that he had not actually seen Myers exit Wal-Mart, but rather, he recognized Myers's front license plate from across the expansive parking lot after 10:30 p.m. Johnson claimed that it was then that he called Myers and asked for a ride, and Myers unwittingly picked him up.

¶45.    Johnson also provided the trial judge with a different version of how the gun and money ended up in Myers's trunk. At trial, he testified that Myers had stopped on the interstate and placed the bag in the trunk. At the post-trial hearing, Johnson testified:

> [w]hen the police pulled us over, the police hopped out with a gun, told us to put our hands up, and he said what the F going on [sic]. Then he [(Myers)] got out of the car, and the police told him to walk backwards. And I let my seat back, and then I reached back there and pulled the little string thing, and I throwed [sic] the money back there."[18]

¶46.    Following a thorough examination of Johnson's plea testimony, trial testimony (including his two pretrial letters), post-trial letters, and post-trial testimony which contained different versions of the events of that night, the trial court concluded that "Johnson's

---

[18]Johnson's new version of how the bag found its way into Myers's trunk conflicted with his own testimony at trial. It further conflicted with the testimony of both the arresting deputy and the Madison police officer who conducted the inventory search of the vehicle at the station. The arresting deputy testified that, when he stopped Myers and Johnson, both placed their hands on the interior roof of Myers's vehicle before he (the deputy) exited his vehicle. *See supra* ¶ 5. Additionally, both the deputy and the officer testified that, upon inspection of the vehicle, neither could locate any way to access the trunk from the interior of the vehicle.

testimony is just not credible at all as it relates to what he testified to today." There is ample support in the record, including photographic evidence, for the trial court's finding that Johnson's recantation lacked credibility. Based on the entire record before this Court, we cannot conclude that the trial court abused its discretion, factually or legally, in denying Myers's motion for a new trial.

## V. Whether the trial court sentenced Myers to a term in excess of his present life expectancy.

¶47. This Court repeatedly has held that "sentencing lies within the sole discretion of the trial court and, generally, will not be disturbed on appeal 'so long as it does not exceed the maximum term allowed by statute.'" *Mosley v. State*, 104 So. 3d 839, 841 (Miss. 2012) (quoting *Gibson v. State*, 731 So. 2d 1087, 1097 (Miss. 1998)).

¶48. Upon his 2007 conviction, Myers was sentenced to five years in the custody of the Mississippi Department of Corrections (MDOC), with four years suspended and four years supervised probation. On July 24, 2012, the circuit court entered an order revoking Myers's supervised probation and remanding him to the custody of the MDOC to serve the remainder of his sentence.[19]

¶49. Following his present convictions, the jury did not impose a life sentence for any of Myers's armed-robbery convictions. Thereafter, the trial court conducted a sentencing

---

[19]That order is not part of the record in the present case. However, a copy of the "Order of Revocation" is attached as an appendix to Myers's "Brief of Appellant." According to the order, Myers's probation was revoked because he had "failed to report since 10-6-2011[.]"

22

hearing.[20] Noting that his present life expectancy was 35.6 years, the trial court sentenced Myers to thirty-five years for each count of armed robbery. The trial court ordered that those sentences be served concurrently.

¶50.    Myers makes no argument on appeal that his concurrent thirty-five-year sentences for armed robbery "exceed[ed] the maximum term allowed by statute." *Mosley*, 104 So. 3d at 841. Instead, Myers argues that his present sentences for armed robbery "were not calculated to be less than his life expectancy of 35.6 years" because, under Mississippi Code Section 99-19-21(2),[21] his previous sentence had been revoked and he "was statutorily precluded from beginning the service of the sentences for his three armed robbery convictions . . . until he had first completed the service of his previous four year prison sentence."

---

[20]*See* Miss. Code Ann. 97-3-79 (Rev. 2006) (A person convicted of armed robbery "shall be imprisoned for life in the state penitentiary if the penalty is so fixed by the jury; and in cases where the jury fails to fix the penalty at imprisonment for life in the state penitentiary the court shall fix the penalty at imprisonment in the state penitentiary for any term not less than three (3) years.")

[21]Section 99-19-21(2) provides, in pertinent part,

[w]hen a person is sentenced to imprisonment for a felony committed while the person was on parole, probation, earned-release supervision, post-release supervision or suspended sentence, the imprisonment shall commence at the termination of the imprisonment for the preceding conviction. The term of imprisonment for a felony committed during parole, probation, earned-release supervision, post-release supervision or suspended sentence shall not run concurrently with any preceding term of imprisonment.

Miss. Code Ann. § 99-19-21(2) (Rev. 2007).

¶51.    Myers's argument is without merit. This Court has stated, "each sentence is to be imposed without respect to the other." ***Erwin v. State***, 557 So. 2d 799, 803 (Miss. 1990). The trial court was not required to consider whether Myers still had time to serve on another sentence any more than it was required to consider the sentences imposed on separate counts within the same conviction. To do otherwise, "circumstances might well arise where it will be impossible for the State to impose any meaningful sentence where more than one crime was committed." ***Id***. (citing ***Harper v. State***, 463 So. 2d 1036, 1041 (Miss. 1985)). Such a result would be in hopeless conflict with Mississippi Code Section 99-19-21(1)[22] and would vitiate a trial court's discretion to impose consecutive sentences.

¶52.    Myers has failed to demonstrate that the trial court imposed any sentence upon his present convictions which exceeded the statutory maximum. Thus, we will not disturb those sentences on appeal.

<u>CONCLUSION</u>

¶53.    Based upon our analysis, we affirm the judgments of conviction and sentencing order of the Circuit Court of Madison County.

¶54.    **COUNT I: CONVICTION OF ARMED ROBBERY AND SENTENCE OF THIRTY-FIVE (35) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF ARMED ROBBERY AND SENTENCE OF THIRTY-FIVE (35) YEARS IN THE**

---

[22]Section 99-19-21(1) provides, "[w]hen a person is sentenced to imprisonment on two (2) or more convictions, the imprisonment on the second, or each subsequent conviction shall, in the discretion of the court, commence either at the termination of the imprisonment for the preceding conviction or run concurrently with the preceding conviction." Miss. Code Ann. § 99-19-21(1) (Rev. 2007).

24

**CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF ARMED ROBBERY AND SENTENCE OF THIRTY-FIVE (35) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT V: CONVICTION OF CONSPIRACY TO COMMIT ARMED ROBBERY AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT VI: CONVICTION OF POSSESSION OF A FIREARM BY A CONVICTED FELON AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. AFTER APPELLANT HAS SERVED ONE (1) DAY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, APPELLANT SHALL BE RELEASED AND SERVE FIVE (5) YEARS ON SUPERVISED POST-RELEASE SUPERVISION, UNDER THE DIRECTION OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS. SENTENCES IN COUNTS I, II AND III SHALL RUN CONCURRENTLY. SENTENCE IN COUNT V SHALL RUN CONCURRENTLY WITH THE SENTENCES IN COUNTS I, II AND III. SENTENCE IN COUNT VI SHALL RUN CONSECUTIVELY WITH THE SENTENCES IN COUNTS I, II, III AND V. APPELLANT SHALL PAY COURT COSTS, FEES AND ASSESSMENTS IN THE AMOUNT OF $1,602.50 TO BE PAID-IN-FULL WITHIN NINETY (90) DAYS FOLLOWING RELEASE FROM CUSTODY.**

**LAMAR, CHANDLER, PIERCE AND COLEMAN, JJ., CONCUR. COLEMAN, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY PIERCE, J.; RANDOLPH, P.J., JOINS IN PART. KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND KITCHENS, J. WALLER, C.J., NOT PARTICIPATING.**

**COLEMAN, JUSTICE, SPECIALLY CONCURRING:**

¶55.   I concur with the majority's holding that Lyndon Myers is not entitled to the necessity defense. However, in the end, I am of the opinion that, even if the concerns raised by the dissent regarding the looseness of the jury instruction's time frame and the uncertainty about which of two possible possessions form the basis of Myers's conviction for possession of the gun should carry the day, I do not believe the facts adduced at trial sufficiently support the

25

second element of the necessity defense. I write separately to explain my opinion that, even in light of Justice King's dissent, Myers is not entitled to it.

¶56. When the question of whether to grant a jury instruction is close, "the trial court should err on the side of inclusion rather than exclusion . . . ." *Flowers v. State*, 51 So. 3d 911, 912-13 (¶ 6) (Miss. 2010). Justice King argues the necessity defense is proper because the jury instruction would include "on or about May 16, 2012." Given that Myers was charged with possession "on or about May 16th," it is unclear whether the jury convicted Myers of possession when he visited Johnson with his son or possession when the gun was found in his car. I think that even if Justice King's concerns are valid, they are without merit because Myers has failed to make out a prima facie case for the necessity defense.

¶57. The necessity defense has three essential elements: "(1) the act charged must have been done to prevent a significant evil; (2) there must have been no adequate alternative; and (3) the harm caused must not have been disproportionate to the harm avoided." *McMillian v. City of Jackson*, 701 So. 2d 1105, 1107 (¶ 8) (Miss. 1977). Myers fails to make a prima facie showing that there was no adequate alternative. In *McMillian*, McMillian argued that she had no other alternative but to participate in an abortion protest on the grounds of the abortion clinic. *Id.* at 1108 (¶ 11). Her protest constituted trespass, and she claimed it was a necessity because unborn children were in imminent harm. *Id.* The Court refused the necessity defense stating that "McMillian could have sought an injunction to prevent any unlawful action at the clinic in advance of the date McMillian was compelled to trespass." *Id.* The Court reasoned that "[c]learly, [an injunction] would have been a better alternative

26

than violating the law." *Id.* Under the instant case, Myers was not able to take action in advance, but even in spite of that, Myers clearly had other immediate alternatives to touching the gun. Myers testified Johnson was sitting on the couch and the gun was on the coffee table; Myers could have simply told Johnson to remove the gun from the area. Moreover, Myers could have just as easily taken his son and left the house. While proving a negative is difficult, the second element of the necessity defense requires it, and the record before the Court simply does not support the conclusion that Myers had no reasonable alternative to possessing the gun to protect his son.

¶58. The Court in *Flowers* reached the opposite conclusion, finding that the defendant had made a "prima facie showing of the necessity defense." *Flowers*, 51 So. 3d at 913 (¶8). Flowers testified that "he had no time to do anything but break into the house" because "someone was after him with a gun . . . ." *Id.* Myers was not faced with a moving third party or a party chasing him. Although he testified his son was active, the danger was a static item, the gun sitting on the coffee table. The gun was, undeniably, a threat to the safety and well being of his son, but the facts clearly support that Myers just as easily could have asked Johnson to move the gun or left.

¶59. At trial, Myers's attorney asked whether Myers "consider[ed] . . . any other alternative available to [him] other than to pick that gun up and make sure that Earnest got it away from [his] son." Myers answered, "For the safety of my son that was about it." When his attorney reworded the question, Myers then said "No, sir." The line of questioning by Myers's attorney misstates the test. The test is not whether Myers "considered" any other alternative,

but whether any other adequate alternative in fact was available to him.  In *McMillian*, the defendant did not consider an injunction as an alternative, but the court found that it was a clear alternative.  *McMillian*, 701 So. 2d at 1108 (¶ 11).

¶60.    In *McMillian*, McMillian also argued that, under *O'Bryant v. State*, she was entitled to the necessity defense because the *O'Bryant* Court observed that the defendant had the right, for "every lawful defense [the defendant] asserts, even though based upon meager evidence and highly unlikely, to be submitted as a factual issue to be determined by the jury under proper instruction of the court." *McMillian*, 701 So. 2d at 1108 (¶ 13) (quoting *O'Bryant v. State*, 530 So. 2d 129, 133 (Miss. 1988)).  In response, the Court drew a distinction between where "the lack of an adequate alternative is less than meager" as opposed to "non-existent" and not "supported by any evidence." *McMillian*, 701 So. 2d at 1108 (¶ 14) (citing  *Abram v. State,* 606 So. 2d 1015, 1035 (Miss.1992), *overruled on other grounds by Foster v. State*, 961 So. 2d 670 (Miss. 2007)).  In other words, the Court will not grant a jury instruction where the necessity defense is nonexistent, as here, other alternatives clearly were available to Myers.

¶61.    The evidence did not support the giving of a necessity defense instruction because it was devoid of any evidence that Myers lacked any reasonable alternative to possessing the gun.

        **PIERCE, J., JOINS THIS OPINION.  RANDOLPH, P.J., JOINS THIS OPINION IN PART.**

        **KING, JUSTICE, DISSENTING:**

28

¶62. I dissent as to Issue II, whether the trial court erred in denying Myers's necessity instruction. Because I believe that the trial court should have granted Myers's instruction on necessity as a defense to his felon in possession of a firearm charge, I would reverse and remand his conviction for that offense.

¶63. Myers was charged in a multi-count indictment with several felonies. These included count VI, which charged that:

> [B]ased upon a series of acts connected together and constituting parts of a common scheme and plan, LYNDON C. MYERS, on *or about* the 16th day of May, 2012, in the county aforesaid and within the jurisdiction of this Court, did unlawfully, knowingly, and feloniously possess a firearm when LYNDON C. MYERS, the said defendant, had previously been convicted of a felony offense. . . .

(Emphasis added.)

¶64. The State offered proof that Myers's thumb print was identified on a 9MM pistol found in the bag with money, which had been stolen from Dollar Tree, allegedly by Earnest Johnson, on May 16, 2012. Myers testified that he and his infant son had visited Johnson's home approximately four or five days prior to the robbery (May 11 or 12, 2012), that he saw the pistol on a table, and that he moved it to prevent injury to his son. That testimony is as follows:

> Q. You were here yesterday when the fingerprint man testified?
> A. Yes, Sir.
> Q. And how he testified that it was your right thumb print --
> A. --Yes, sir.
> Q. -- on the Taurus nine millimeter pistol that was found in the bag along with the robbery money?
> A. Yes, sir.
> Q. You heard that testimony?

29

A. Yes, sir.

Q. Did you at any time on the day of the robbery, May 16, 20121[sic], did you at any time on that day handle or touch in any way that firearm?

A. No, sir.

Q. Who did that firearm belong to?

A. Earnest Johnson.

Q. Okay. Have you ever handled that firearm in the past?

A. Yes, sir, I have touched it. You know, the fingerprint guy said he has seen fingerprints last up to years.

Q. Well, tell the jury when you touched the gun the last time?

A. I came to Earnest's house maybe -- it was on a Saturday, me and my son came to the house. I have a three-year-old son. When I came to Earnest's house, he had the firearm laying on the coffee table. So I grabbed the gun and told him to put it up. I only did it because of the safely of my son. If my son hadn't been there, I would have never touched it. When I walked in the house, he had the gun laying on the coffee [t]able, on the coffee table in his house. I was really just stopping by for a slight visit because him and his friend-girl had just moved into that apartment, and I wanted to just come through and just show my respects. So I came in. He had the gun sitting on the coffee table. I grabbed the gun and told him to put it up. "Put this up, man." That's how my fingerprint got on the gun.

Q. Is that the only time you've ever touched it?

A. Yes, sir.

Q. How long prior to May 16th of this year did that happen when you touched the gun?

A. Maybe four to five days before.

Q. Four to five; is that what you said?

A. Yes.

Q. Okay. And who was with you on that occasion when you touched the gun?

A. Me, my son, and Earnest.

Q. And how old is your son?

A. Three years old.

Q. Was the gun loaded?

A. Yes, sir. Well, I have no idea, Mr. Ritchey. I don't know if it was or not. I don't know. Knowing Earnest, it probably was. I don't know. I just told him to put it up.

Myers was also questioned vigorously about this episode on cross-examination, and not only did his story remain the same, but also he testified that his son was very active.

¶65.    The State received instruction S-6, which read:

> LYNDON C. MYERS has been charged in Count VI of the indictment with the crime of *Possession of a Firearm by a Convicted Felon.* If you find from the evidence in this case beyond a reasonable doubt that:
> 1. LYNDON C. MYERS, on *or about* the 16th day of May, 2012, in Madison County, Mississippi;
> 2. Did unlawfully, knowingly and feloniously possess a firearm;
> 3. When, LYNDON C. MYERS, had previously been convicted of a felony offense;
>
> then you shall find the Defendant, LYNDON C. MYERS, guilty of *Possession of a Firearm by a Convicted Felon* as charged in Count VI of the Indictment.
> If the State has failed to prove any one or more of the above-listed elements beyond a reasonable doubt, then you shall find the Defendant, LYNDON C. MYERS, not guilty of *Possession of a Firearm by a Convicted Felon.*

(Second emphasis added.)

¶66.    Myers agreed to the grant of S-6, provided he received D-11. That is reflected in the following exchange:

> THE COURT: What about S-6?
> MR. RITCHEY : Your Honor, I don't have any objection to it provided that we get our requested D-11. If we don't, then I think there should be some language about not in necessity. I believe necessity is a defense to the felony possession of a firearm.
> THE COURT: Y'all get that? He's agreeing to the elements as long as he gets D-11.
> MR. GUEST: I know he testified he moved it because of his son, but I don't know that D-11 is supported by the facts in the case. There has been no reasonable alternative, no adequate alternative, and what the State is alleging, Your Honor, is that he possessed the gun on the day in question, which is according to the elements he possessed it on or about May 16th. The proof was that he touched the gun some days and that's how his print got on there. So I don't think D-11 is applicable because he said he didn't even handle the gun on the date in which he is charged in the indictment.

31

¶67.    Myers then asked the trial court to grant instruction D-11, regarding his defense of

necessity to the charge of possession of a firearm by a convicted felon. That proposed

instruction read:

> The Court instructs the jury that necessity is a valid, legal defense to the crime of possession of a firearm by a convicted felon. In order to be entitled to the defense of necessity, the defendant must prove or establish to your satisfaction each of the following: (1) that his possession of the firearm was done to prevent a significant injury; (2) there was no adequate alternative to his possession of the firearm; and (3) the harm, if any, caused by his possession of the firearm was not disproportionate to the harm avoided.

¶68.    The trial court denied this instruction during the following exchange:

THE COURT: D-11?
MR. MAYFIELD: Our objection is that there is no evidentiary basis for a necessity defense.
THE COURT: Given the fact that the defendant is being prosecuted for possessing the gun *on* May 16, 2012, not *three weeks* before.[23]
MR. MAYFIELD: Yes, sir.
MR. RITCHEY: Well, your Honor, I don't know how you instruct the jury. I mean, I would think there would be a tendency on the part of the jury that if they believe – we've admitted he is a convicted felon. And if they believe that ever at any time while he was convicted felon that he handled this weapon, then the prosecution is going to be arguing that's constructive possession, he is a convicted felon, wham, he's guilty, when necessity is a valid defense. I don't know we should be limited to the fact that he didn't present any testimony he touch it by necessity on the day of the 16th. I don't think that should prohibit us from getting this necessity defense. He's entitled to that. It's a good defense to possession of a firearm by a convicted felon.
THE COURT: Unless he possessed it during the commission of conspiring with another to commit an armed robbery. Isn't that right?
MR. MAYFIELD: Your Honor, he is not charged with possessing it on the day he touched it or says he touched it.

---

[23]Myers specifically testified that he touched the gun four or five days before May 16, 2012. Moreover, the State chose to prosecute Myers not for possession on May 16, 2012, but for possession of the firearm on *or about* May 16, 2012.

32

MR. RITCHEY: I don't know that the jury can comprehend that distinction.

MR. MAYFIELD: Counsel has a perfectly good constructive possession instruction with respect to it having been in its – arguably subject to a dominion and control *on* the 16th of May.

MR. RITCHEY: I think we need some kind of instruction, Judge, that they can't convict him for being a felon in possession of a firearm unless they find that he possessed the firearm *on* May 16th.

THE COURT: You've got that in the elements instructions.

MR. MAYFIELD: And they have been instructed on constructive possession.

THE COURT: D-11 will be refused.

(Emphases added.) Thus, Myers specifically requested that the jury be instructed that the felon in possession charge was only for possession *on* May 16, 2012, and the trial court maintained that his request was fulfilled by S-6, despite the fact that S-6 demanded Myers's conviction for possession on *or about* May 16, 2012.

¶69.    Because instruction S-6 is not restricted to May 16, 2012, the date of the robbery, but instead uses the language "on *or about* May 16, 2012," I believe that Myers should have been given his instruction D-11.  The failure to grant D-11 allowed the jury to ignore Myers' explanation and defense, and convict him for whenever he possessed the pistol.

¶70.    "[A] trial judge, when requested, must properly instruct the jury on the defendant's theory of the case – so long as that theory constitutes a legal defense to the charged offense, is not repetitious, and is supported by evidence."[24] *Flowers v. State*, 51 So. 3d 911, 913-14 (Miss. 2010).  This is because "a party has a right to have jury instructions on all material

---

[24]Interestingly, the majority takes this quote out of context as support for its assertion that necessity does not constitute a legal defense to the charged offense.  Maj. Op. ¶19.  In *Flowers*, this Court held that it was error for the trial court to refuse a necessity instruction. *Flowers*, 51 So. 3d at 913-14.

33

issues presented in the pleadings or evidence." *Id.* at 912 (internal quotations and alterations omitted). If the question of whether a jury instruction should be granted is close, "the trial court should err on the side of inclusion rather than exclusion." *Id.* at 912-13 (internal quotations omitted). Furthermore, the trial court "must consider the evidence in the light most favorable to the accused, and consider all reasonable favorable inferences that may be drawn from the evidence in favor of the accused." *Id.* at 913 (internal quotations and alterations omitted).

¶71. The necessity defense excuses what would otherwise be criminal conduct when the act was done to prevent a significant evil, no adequate alternative existed, and the harm caused by the act was not disproportionate to the harm avoided by it. *Id.* In *Flowers*, the defendant in a house-burglary prosecution testified that he broke into the house because someone was trying to shoot him. *Id.* at 911-13. The prosecutor chose to cross-examine him about other options, but he insisted that there were none but to break into the house. *Id.* at 913. "This testimony, if believed, established a prima facie showing of the necessity defense." *Id.* Likewise, in this case, Myers testified that a gun that he believed was likely loaded was in the immediate vicinity of, and within the reach of, his very active toddler. He testified that he picked it up and handed it to the owner simply to keep his child from harm. If believed, this testimony established a prima facie showing of the necessity defense. As the Court in *Flowers* noted,

> In a criminal prosecution, trial and appellate judges do not always find the defendant's testimony believable, credible, or consistent with other evidence. Still, it is evidence. And no citation of authority is necessary for the

bedrock legal principle that juries, not judges, determine the weight and credibility of the evidence – including the defendant's testimony.

And it is the jury's responsibility, after determining the facts, to apply them to the law provided by the trial court. Yet, had the jurors believed [the defendant's] testimony, they could not have done so, because the trial judge provided them no instruction on the law of necessity.

*Id.* The Special Concurrence, without knowing exactly where the child and Myers were in relation to the loaded gun, makes suppositions regarding situations not found in the record as to the "reasonable alternatives" it believes Myers had. Myers testified as to the necessity of keeping a loaded gun away from his "very active" toddler. The trial court should err on the side of inclusion rather than exclusion and the trial court "must consider the evidence *in the light most favorable to the accused*, and consider *all reasonable favorable inferences* that may be drawn from the evidence *in favor of the accused*." **Flowers**, 51 So. 3d at 913 (emphases added) (internal quotations and alterations omitted). When using this standard, an inference must be made that the toddler, Myers, and Johnson were in physical positions that rendered Myers picking up the gun as the only reasonable alternative. The imaginings of the Special Concurrence that consider the evidence in a light most favorable to the State do not change this standard or render Myers's testimony irrelevant.

¶72. The majority, as did the trial court before it, fails to account for the vague indictment and jury instruction which charge that Myers possessed a firearm "on *or about* May 16th." The robbery occurred on May 16. Instead of choosing to state "May 16th" in the indictment and jury instruction, the state chose to charge Myers with felon in possession of a firearm "on *or about* May 16th" and so instruct the jury. Due to the vague date in the instruction, the jury

35

clearly could have thought that May 12 was "about" May 16 and convicted Myers for his possession of the gun at Johnson's home. The jury was given no instructions to find otherwise, because the trial court failed to instruct it on the law of necessity. The majority emphasizes that the gun was found in the trunk of the car driven by Myers on May 16. This does not change the fact that no one knows whether the jury actually convicted Myers for this alleged "possession" or whether they convicted him instead for the May 11 or 12 possession of the gun. We have no way of knowing to which possession the conviction applied, due to the vague indictment. Indeed, the majority attempts to explain this away by noting that "Myers offered no testimony as to the necessity of possession of the gun . . . . in the trunk of the car he was driving shortly after the armed robbery of May 16" Maj. Op. ¶17. It also claims that "Myers's admission that he handled the gun prior to the robbery, even if believed, does not alter the fact that, when he was arrested on May 16, the gun was in his possession." Maj. Op. ¶19. The majority's argument flies in the face of the extraordinarily plain language of the indictment and the jury instruction. Had it been so extraordinarily clear that Myers was charged with possession of a firearm *on and only on* May 16, why then, did the trial court refuse to so clearly instruct the jury? The trial court and State instead chose to instruct the jury more ambiguously, allowing them to find him guilty of possession of a firearm *on or about* May 16. The jury instructions should generally say what they mean and mean what they say. The jury instructions allowed the jury to find Myers guilty of possession of a firearm if he possessed it on one of several dates. The majority now attempts to morph an

36

intentionally vague date in the jury instruction into a specific, singular date. The jury's determination of when Myers possessed a firearm is simply unknown.

¶73. Because Myers's testimony established a prima facie showing for the necessity defense, and because the jury instruction on the charge of felon in possession of a firearm was so vague as to encompass Myers's possession of the firearm on May 11 or 12, I believe the trial court erred in not granting Myers's requested instruction on the necessity defense. For this reason, I would reverse Myers's felon in possession of a firearm conviction and remand for a new trial on that charge.

**DICKINSON, P.J., AND KITCHENS, J., JOIN THIS OPINION.**