## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2012-KA-01066-COA

MICHAEL T. ANDERSON A/K/A MICHAEL ANDERSON A/K/A MICHAEL THERONE ANDERSON

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/30/2012 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE MCMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF MURDER, AGGRAVATED ASSAULT, AND FELON IN POSSESSION OF FIREARM, AND SENTENCED AS A HABITUAL OFFENDER TO THREE LIFE SENTENCES TO BE SERVED CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 10/21/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., BARNES AND CARLTON, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.     Michael Anderson was convicted of murder, aggravated assault, and felon in possession of a firearm in the Hinds County Circuit Court.  The trial court sentenced

Anderson to serve three life sentences without the possibility of parole in the custody of the Mississippi Department of Corrections, one life sentence for each count in the indictment. Anderson now appeals his conviction and sentence. Finding no error, we affirm.

**FACTS**

¶2. On April 10, 2009, Anderson shot and killed Drystle Sanders in front of the Triple-A store in Jackson, Mississippi. The record reflects disputed events at the Triple-A store culminating in the shooting death of Sanders. However, the record reflects no dispute existed as to the activities of Sanders, Sylvester Coleman, their mothers, and Coleman's stepbrother during that evening, prior to driving to the Triple-A store, as well as the events occurring subsequent to the shooting.

¶3. Sanders and his mother, Wysia Sanders, along with Ernestine Coleman, Sylvester Coleman, and Ernestine's stepson, Travis Brown, spent time that evening together pleasantly visiting and hanging out, and drove to the Triple-A store to get chips, cigarettes, and beer. We will review the facts and events of the evening in question as set forth in the testimony of the various witnesses.

¶4. Coleman's mother, Ernestine Coleman, testified that she arrived to the Sanders home with Coleman, her son, and Travis Brown, her stepson, on the evening of April 10, 2009. Sanders and Wysia Sanders were inside of the house. Ernestine Coleman stated that she had been at the house for approximately thirty minutes before the group decided to go to the Triple-A store to purchase beer and cigarettes. Ernestine Coleman testified that when the group drove to the store, "[e]verybody was in a good mood . . . laughing, joking." Ernestine stated that she, Wysia Sanders, and Brown remained inside of the car, while Coleman and

2

Sanders went inside to purchase beer and cigarettes.

¶5.     Another witness, Wysia Sanders, testified that on April 10, 2009, she picked up her son, Sanders, from his job at Labor Finders around approximately 3:30 p.m. Wysia Sanders testified that she had not seen her son all day, until she picked him up from work. Wysia Sanders stated that after picking up Sanders, the two purchased something to eat, then stopped by to visit a friend at the funeral home. She then dropped off Sanders at his friend's house to play "videos or something [and listen] to music." Wysia Sanders stated that Sanders's girlfriend dropped him back off at home around 10:30 p.m. Wysia Sanders testified that Ernestine Coleman, Coleman, and Brown then arrived at the house, and the group "[sat] around laughing and grinning and talking." Wysia Sanders stated that Coleman and Sanders expressed that they wanted to purchase more cigarettes, so Ernestine Coleman offered to drive everyone to the store. Wysia Sanders also testified that on the way to the store, "everybody was happy." When asked on cross-examination whether Sanders and Coleman intended to purchase cigarettes and beer at the Triple-A, Wysia Sanders answered "cigarettes."

¶6.     Coleman testified that he, his mother, and stepbrother arrived at the Sanders home at 7 p.m. on April 10, 2009.[1] Coleman stated that while at the house, "we sat around a little while," watching television. He further testified that: "We had brought a couple of beers with us and we ran out and we was going back to the store to get some more."

¶7.     Travis Brown testified that on the afternoon before the shooting, he, Coleman, and

---

[1] Sylvester Coleman's mother is Ernestine Coleman, and his stepbrother is Travis Brown.

3

Ernestine Coleman "[were] chilling" at home, "having fun." The trio decided to ride around, and ended up at the Sanders house at approximately 10 p.m. Once at the Sanders's house, Brown testified that the group played dominoes, and eventually decided to go to the store "to get a few beers and get us a couple of snacks." Brown admitted that "[w]e had a few drinks." The testimony reflecting the activities throughout the evening reflect that no dispute exists that Sanders, along with Coleman and Brown, consumed some beer together while hanging out that evening.

**The Store**

¶8. Different witnesses perceived different pieces of the events occurring at the Triple-A store that culminated in the shooting death of Sanders. At the Triple-A, Anderson (the appellant) maintains that he was outside of the store when Sanders and Coleman walked into the store. Ernestine Coleman, Brown, and Wysia Sanders all testified that they remained inside their car while Sanders and Coleman went into the store to buy beer and snacks.

¶9. Anderson testified that he "spoke with a hand gesture" to the two women in the car, and according to Anderson, the women did not speak to him. Anderson testified that he went into the store and spoke to the clerk. He testified that he told the clerk that he felt he needed to clean up his act because the women had looked at him like he was "from another planet." Anderson testified that after his conversation with the clerk, Sanders told him that the women were his and Coleman's mothers.

¶10. However, the record reflects Coleman's testimony that he possessed no recollection of speaking to Anderson in the store, and Coleman also testified that he recalled Sanders exited the store before Coleman. Coleman's testimony reflects that he recalled no

4

conversation with Anderson inside of the store, but Anderson testified differently, providing that Sanders seemed agitated and stormed out of the store with Coleman. Anderson testified that after he purchased his items, he then exited the store. Upon leaving the store, Anderson provided testimony claiming that he was hit in the back of the head and knocked to the ground. Anderson also testified that he raised up his hands to protect his head, and that he was hit again. Anderson testified that after he was hit the second time, a gun fell to the ground. Anderson testified that he grabbed the gun and testified that he then shot Sanders in self-defense. Anderson testified that after shooting Sanders, he walked home to his mother's house. Curiously, the police investigation of the shooting revealed two different types of bullet casings, fired from two different guns, at the scene, and trial testimony reflects that no witnesses saw Sanders with a gun.

¶11. With respect to Sanders's companion in the store, Coleman testified that when he walked out of the Triple-A Store, he saw Sanders and another man "tussling." Shots were fired, and Coleman heard a gunshot and saw Sanders fall to the ground. Coleman testified that the shooter, later identified as Anderson, then turned and pointed the gun at him (Coleman). Anderson fired at Coleman as Coleman started running away from the store and out of the parking lot. Coleman testified that he fled after he saw Anderson shoot Sanders, and he testified that his mother, Ernestine, drove away and picked him up on a nearby street, around the corner. The group in the car (Coleman, Ernestine, Brown, and Wysia Sanders) then returned to the store to check on Sanders. Coleman explained that as he, his mother, Wysia Sanders, and Brown drove back to the store to check on Sanders, they passed Anderson as he was walking "the opposite way from the store" on Ridgeway Street.

5

Coleman testified that as the car approached the store, Anderson began shooting at the car as he walked down Ridgeway Street away from the store.

¶12.    The record reflects that the store clerk had already exited the store to check on Sanders, as well.  The record shows that Sanders suffered several gunshot wounds, and was pronounced dead on the scene by law enforcement and medical personnel.  Investigators recovered five spent 9 millimeter cartridge casings on and around Sanders's body, and found two more spent 9 millimeter cartridge casings 120 feet away from Sanders's body.  Brian McIntyre, a forensic scientist at the Mississippi Crime Laboratory, testified that the casings were fired from two separate guns — all five casings recovered from on and around Sanders's body were fired from one gun, and the two casings located 120 feet from Sanders's body were fired from a second gun.

¶13.    With respect to events subsequent to the shooting, off-duty Jackson Police Department Investigator Garland Ward was exiting the establishment next door to the Triple-A Store at the time of the murder.  Ward testified that he was walking to his vehicle when he heard a commotion in the nearby lot.  He heard two shots, saw Sanders fall to the ground, and saw Anderson standing over Sanders, lying on the ground, aiming the gun at him.  Ward saw Coleman running from the store yelling at the occupants of a car to "get down."  Ward immediately called another investigator and heard more shots while he was on the phone. When he looked back toward the scene, he testified that he saw Anderson walking off away from the store and down the road.  Ward later identified Anderson from a photo lineup.

¶14.    Another witness at the shooting, Stephen Johnson, testified that he was driving past the convenience store when he saw Sanders lying on the ground.  As Johnson pulled in to the

6

lot, he saw Anderson stand over Sanders and fire two more shots. Johnson stated that he and Anderson made eye contact, and then Johnson witnessed Anderson walking off. Then, as Johnson pulled out of the lot, he testified that he saw a woman walk out of the store. Johnson testified that the woman went up to Sanders's body and "looked at it, leaned over, and walked back inside the store." At trial, Johnson identified Anderson as the shooter.

¶15. Ernestine testified that after driving away from the Triple-A after Sanders was shot, she picked up Coleman down the street and around the corner from the store. After he got in the car, Ernestine drove back to the store. She testified that as they drove back to the store, she witnessed Anderson "coming on the side of the store walking, shooting. . . . [H]e was shooting at my car or us."

¶16. Brown, Ernestine's stepson and Coleman's stepbrother, testified that he was sitting in the car outside of the Triple-A while Coleman and Sanders were in the store. Brown looked up and witnessed Anderson and Sanders "tussling" outside of the store. Brown instructed his stepmother to open the door, and began helping her locate the locks on the car door. Brown testified that he heard gunshots, looked up, and saw Sanders fall. Brown testified that he then witnessed Anderson start shooting at Coleman. Brown stated that Coleman instructed Brown, Ernestine Coleman, and Wysia Sanders to drive away from the store, and Coleman followed, running after them. Brown testified that they stopped the car on the next street so that Coleman could get in, and then they made a block around the store in order to go back and check on Sanders. As the group in the car drove back towards the store, they passed Anderson on Ridgeway Street. Brown testified that Anderson was walking down Ridgeway Street in the direction away from the store. Anderson fired shots at the

7

passing car containing Ernestine Coleman, Wysia Sanders, Coleman, and Brown. Brown testified that Anderson continued walking on Ridgeway Street and away from the store, providing Brown, Coleman, Wysia Sanders, and Ernestine Coleman a chance to go back to the store and check on Sanders.

**Evidence of Alcohol Consumption**

¶17. We turn to acknowledge the facts relevant to Anderson's assignment of error related to exclusion of the victim's post-mortem blood-alcohol results. As previously stated, Coleman's mother, Ernestine Coleman, testified that she, Coleman, and Brown had only been at the Sanders residence for approximately thirty minutes before the group decided to go to the Triple-A store to purchase beer and cigarettes. Ernestine Coleman testified that when the group drove to the store, "[e]verybody was in a good mood . . . laughing, joking." When asked by the defense whether "Sanders had something to drink prior" to the shooting, the State objected, and the trial court sustained the objection. The defense also read portions of Ernestine Coleman's statement, given to police on April 11, 2009, the day after the shooting, into evidence, describing that she, Wysia Sanders, Sanders, Brown, and Coleman arrived to the Triple-A a little after 10 p.m. on April 10, 2009. As previously stated, the record reflects Brown and Coleman both testified that they drank beer with Sanders that evening, prior to the shooting, and drove to the Triple-A store with the intent to purchase more beer.

¶18. The jury also heard testimony from Ward; Officers Charles Taylor, Darryl Stasher, Quincy Russell, and Kimberly Brown of the Jackson Police Department; Deputy Donald Rhodes of the Hinds County Sheriff's Department; Brian McIntyre, a forensic scientist at the Mississippi Crime Laboratory; Jacob Burchfield, a forensic chemist in the Trace Evidence

8

Section of the Mississippi Crime Laboratory; and Dr. Amy McMaster, a forensic pathologist. The trial court refused to admit Sanders's post-mortem blood-alcohol content into evidence. The jury convicted Anderson of murder, aggravated assault, and felon in possession of a firearm. The trial court sentenced Anderson as a habitual offender to three life sentences.

¶19. Anderson now appeals, claiming the following assignments of error: (1) the trial court erred in giving a flight instruction to the jury; (2) the trial court erred in giving jury instruction S-7, which prevented Anderson from having his theory of self-defense submitted to the jury on the felon-in-possession-of-a-firearm charge; and (3) the trial court erred in refusing to allow evidence of Sanders's blood-alcohol level at the time of his autopsy.

## STANDARD OF REVIEW

¶20. This Court gives "abuse-of-discretion deference to the trial judge's decision" with regard to giving or refusing jury instructions. *Flowers v. State*, 51 So. 3d 911, 912 (¶5) (Miss. 2010). In determining if any error occurred regarding the jury instructions presented at trial, the instructions given must be read as a whole. *Sheffield v. State*, 844 So. 2d 519, 524 (¶12) (Miss. Ct. App. 2003) (citing *Turner v. State*, 721 So. 2d 642, 648 (¶21) (Miss. 1998)). No reversible error will be found where the jury instructions fairly announce the law of the case and create no injustice. *Johnson v. State*, 908 So. 2d 758, 764 (¶20) (Miss. 2005) (citing *Williams v. State*, 863 So. 2d 63, 65 (¶5) (Miss. Ct. App. 2003)). "A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Byrom v. State*, 863 So. 2d 836, 874 (¶129) (Miss. 2003) (quoting *Heidel v. State*, 587 So.

9

2d 835, 842 (Miss. 1991)). Jury instructions are within the sound discretion of the trial court. *Goodin v. State*, 787 So. 2d 639, 657 (¶60) (Miss. 2001).

¶21.    A trial judge possesses a great deal of discretion as to the relevancy and admissibility of evidence. *Gilley v. State*, 748 So. 2d 123, 126 (¶5) (Miss. 1999). Unless the judge abuses his discretion so as to be prejudicial to the accused, the Court will not reverse this ruling. *Id.*

## DISCUSSION

### I.    Flight Instruction

¶22.    Anderson argues that the trial court erred in giving instruction S-6, a flight instruction, to the jury, thus allowing the jury to infer guilt from the act of Anderson's purported flight from the scene of the shooting. Anderson submits that he objected to the State's flight instruction, arguing that because he raised self-defense as his defense theory at trial, then the trial court erred in giving the flight instruction.

¶23.    The instruction presented to the jury herein stated:

> "Flight" is a circumstance from which guilty knowledge and/or fear of arrest may be inferred. If you believe from the evidence in this case beyond a reasonable doubt that . . . [Anderson] did flee or go into hiding, such flight or hiding is to be considered in connection with all other evidence in this case. You will determine from all the facts whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things and give it such weight as you think it is entitled to in determining the guilt or innocence of [Anderson].

¶24.    In reviewing this assignment of error, we acknowledge that this Court applies an abuse-of-discretion standard for reviewing a trial court's decision to give or refuse jury instructions. *Flowers*, 51 So. 3d at 912 (¶5). When reviewing the giving or refusal of jury instructions, this Court reads the instructions as a whole, rather than singling out any one

10

instruction or taking the instructions out of context. In turning to precedent to assist in our review, we find that in *Fuselier v. State*, 468 So. 2d 45, 56-57 (Miss. 1985), the supreme court explained that "an instruction that flight may be considered as a circumstance of guilt or guilty knowledge is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge." The supreme court adopted the following two-prong test to determine whether an instruction that flight may be considered is proper: "(1) Only unexplained flight merits a flight instruction; and (2) Flight instructions are to be given only in cases where that circumstance has considerable probative value." *Tran v. State*, 681 So. 2d 514, 519 (Miss. 1996) (citations omitted).

¶25. In this case, the record shows that Anderson presented no evidence of an existing threat at the Triple-A store at the time when he walked away from the store, down Ridgeway Street, after shooting Sanders on the store's sidewalk. The record reflects that the store clerk exited the store and checked on Sanders after Anderson walked off, and that witnesses Ward and Johnson also saw Anderson walk off from the store after shooting Sanders. The record shows Anderson left the store premises after Coleman ran off, and after the car with Ernestine, Wysia, and Brown drove off. Additionally, Coleman and the occupants of the car testified that as they returned to the store to check on Sanders, they spotted Anderson walking down the street and away from the store.

¶26. In applying the law to the facts herein, we turn to precedent for guidance. In *Tran*, the supreme court held the facts of that specific case failed to fall within either of the circumstances where a flight instruction would be appropriate. *Tran*, 681 So. 2d at 519. Instructive to the issues raised by Anderson, the supreme court explained that "Tran's flight

11

was explained by both himself and his co-defendant—they were fleeing to avoid retribution from the friends of [the victim]." *Id.* The *Tran* court relied upon *Banks v. State*, 631 So. 2d 748, 751 (Miss. 1994), which held: "[W]here the person against whom self-defense has been exercised is still alive and has the back up support of other persons, flight seems logical and necessary." *Tran*, 681 So. 2d at 519. The supreme court determined that since "Tran was arguing self-defense and the jury heard the testimony on Tran's flight, it was free to draw its own conclusions as to the flight significance." *Id.* In *Tran*, the court found under these facts that the flight seemed logical and necessary in light of the self-defense argument and the facts of necessity raised therein. *Id.* The *Tran* court remanded the case back to the trial court, holding that it was clearly reversible error to give the flight instruction and call undue attention to Tran's flight. *Id.*

¶27. Also, significant to the resolution of the issue before us in the instant case, in the opinion of *Shumpert v. State*, 935 So. 2d 962, 970 (¶28) (Miss. 2006), the supreme court observed that the defendant therein, Shumpert, claimed that he ran to avoid being hurt by the victim, and this explanation constituted the only explanation Shumpert offered for fleeing from the scene of that crime. However, the supreme court acknowledged that Shumpert also stated the victim did nothing to threaten or harm Shumpert. Trial testimony also provided evidence that the victim never threatened or harmed Shumpert. The supreme court ultimately found in *Shumpert* that the trial court did not err in giving the flight instruction because: "All of this evidence supports the contention that the flight was not explained by any reason other than consciousness of guilt. The trial court agreed and [gave] the flight instruction, and it did not err in doing so." *Id.*

12

¶28.    In applying precedent to the facts of the instant case, the State herein argues that Anderson never provided a reasonable explanation for his flight from the murder scene.[2] The record reflects that Anderson testified that after he shot Sanders, he walked to his mother's house. As reflected by the statement of facts herein, the record shows that various witnesses also testified at trial as to the circumstances after the shooting, and their testimony reflected no evidence of any existing threat to Anderson prior to departing from the Triple-A store where Sanders lay dying.

¶29.    As previously noted, Coleman testified that after he saw Anderson shoot Sanders, Coleman fled from the store, and Ernestine also drove away from the store with Wysia and Brown. Ernestine picked up her son on a nearby street. After Anderson left the store, the group then returned to the store to check on Sanders. As Coleman, Ernestine Coleman, Wysia Sanders, and Brown drove back toward the store to check on Sanders, they passed Anderson as he was walking down Ridgeway Street "the opposite way from the store." The record reflects that they passed him on Ridgeway Street, and Coleman testified that Anderson then pointed the weapon back towards the store and towards their car, firing the gun at them.

¶30.    As previously stated in the review of the facts herein, the record reflects other testimony, including the testimony from witnesses Ward and Johnson, supporting the flight

---

[2] *See also States v. State*, 88 So. 3d 749, 758 (¶38) (Miss. 2012). In *States*, the supreme court found the trial court's error in giving a flight instruction to be harmless error due to the overwhelming evidence of the defendant's guilt. *Id.* The *States* court explained: "An error is harmless if it is clear beyond a reasonable doubt that it did not contribute to the verdict." *Id.* (citations and internal punctuation omitted). In *States*, the supreme court held that based on the overwhelming evidence of the defendant's guilt, the trial court's error in giving the flight instruction did not contribute to the guilty verdict. *Id.*

instruction. The record shows that Johnson pulled back in to the lot to check on the victim when he saw Anderson stand over Sanders and fire two more shots. Johnson stated that he and Anderson made eye contact, and then Johnson witnessed Anderson walking off from the store where Sanders lay dying on the sidewalk and parking area. The record shows that Coleman fled on foot and Wysia Sanders, Ernestine Coleman, and Travis Brown drove off away from the store prior to the point when Anderson began walking away from the store down Ridgeway Street. Also, as previously acknowledged, Johnson stated that a woman then walked out of the store, went up to Sanders's body, and "looked at it, leaned over, and walked back inside the store."

¶31. After our review of the facts of this case and applicable law, we find that in this case, as in *Shumpert,* the record reflects no abuse of discretion occurred by the trial court's giving of the flight instruction herein.[3]

## II. Felon in Possession of a Firearm

¶32. Anderson next argues that the trial court erred in giving instruction S-7, which stated: "The court instructs the jury that self-defense is not a viable defense to possession of a firearm by a convicted felon." *See* Miss. Code Ann. § 97-37-5 (Rev. 2014) (convicted felon may not possess a firearm). Anderson asserts that the trial court committed reversible error by preventing his theory of self-defense from being submitted to the jury on the felon-in-possession-of-firearm charge. Anderson's argument confuses the defense of necessity with that of self-defense.

---

[3] *See Flowers*, 51 So. 3d at 912 (¶5).

¶33. Anderson argues that his theory of defense consisted of arguing that Sanders and Coleman acted as the initial aggressors, and that Anderson possessed the gun out of necessity. We acknowledge, however, that Anderson failed to request that the jury be instructed on the defense of necessity, and we further acknowledge that the facts in the record fail to support a necessity instruction. Anderson testified that after he exited the Triple-A store, he was hit in the head and fell to one knee. Anderson stated that he was hit again, and then "the gun fell the third time that he tried to hit me." Anderson testified that he grabbed the gun and "was trying to point and shoot at the same time." The record reflects no testimony showing that Sanders possessed a firearm or weapon when Anderson shot him.

¶34. In this assignment of error, Anderson acknowledges that self-defense fails to constitute a valid defense to the charge of felon in possession of a firearm. *See Williams v. State*, 953 So. 2d 260, 263 (¶8) (Miss. Ct. App. 2006). Anderson's argument, however, asserts that the trial court's refusal of a self-defense instruction prevented the jury from considering whether Anderson acted out of necessity, and that necessity constitutes a valid defense to this offense. He cites to *Williams*, 953 So. 2d at 263-64 (¶9), wherein the supreme court held that necessity is a valid defense for the charge of felon in possession of a firearm. The *Williams* Court held that "in order to be entitled to a defense of necessity, the defendant must prove the following: (1) the act charged was done to prevent a significant evil, (2) there was no adequate alternative, and (3) the harm caused was not disproportionate to the harm avoided." *Id.*

¶35. A review of precedent relevant to the charge at issue and self-defense reflects that in *Roberson v. State*, 19 So. 3d 95, 101 (¶9) (Miss. Ct. App. 2009), the defendant, a convicted

15

felon, argued that he possessed a weapon based on his alleged belief that he was in imminent and immediate danger of being killed by the victim. This Court found no merit to this argument, acknowledging that "self-defense is not a viable defense to possession of a firearm by a convicted felon." *Id*. (quoting *Williams*, 953 So. 2d at 263 (¶8)). Consistent with precedent, the State argues that self-defense is not a valid defense to the charge of felon in possession of a firearm. The State further asserts that this issue is not properly before this Court because Anderson never requested a necessity instruction at trial. As previously acknowledged, the record indeed reflects that the defense objected to the judge's instruction in S-7 informing the jury that self-defense failed to constitute a defense to possession of a firearm by a convicted felon. However, the defense never requested a necessity instruction.[4]

¶36. A review of precedent as well as section 97-37-5, which defines the offense of felon in possession of a firearm, reflects that the State correctly argues that self-defense fails to constitute a defense to that crime.[5] Clearly, the statute establishing the offense, section 97-37-5, contains no self-defense exception. Therefore in this case, the trial court properly instructed the jury that self-defense failed to constitute a defense to the charge against Anderson for the charged offense of felon in possession of a firearm.

¶37. Furthermore, as acknowledged, necessity indeed provides a valid defense to the offense of felon in possession of a firearm, but as also acknowledged, the record must contain an evidentiary foundation to support the defense. *See Williams*, 953 So. 2d at 263-64 (¶9);

---

[4] Instruction S-7 stated: "The court instructs the jury that self-defense is not a viable defense to possession of a firearm by a convicted felon."

[5] *See Williams*, 953 So. 2d at 263-64 (¶9).

*Lenard v. State*, 828 So. 2d 232, 237 (¶25) (Miss. Ct. App. 2002). With respect to the required evidentiary foundation, the supreme court has found the defense of necessity available only where the defendant reasonably acts out of fear of imminent danger of death or serious bodily harm to himself or others. *Stodghill v. State*, 892 So. 2d 236, 238 (¶8) (Miss. 2005). As previously discussed, the supreme court established that in order to support an instruction on necessity, the defendant must prove the following: "(1) the act charged was done to prevent a significant evil, (2) there was no adequate alternative, and (3) the harm caused was not disproportionate to the harm avoided." *Williams*, 953 So. 2d at 263-64 (¶9).

¶38. Instructive to the case before us, in *Williams*, the supreme court found that the necessity instruction was not justified in that case because Williams failed to show that no adequate alternative existed but to possess the gun. *Id*. at 264 (¶10). In this case, Anderson not only failed to request an instruction on the necessity defense, but the record also fails to support any evidentiary basis for instructing the jury on the necessity defense since Anderson failed to show that no adequate alternative was available other than possessing the firearm he used to shoot Sanders, when Sanders was unarmed.

¶39. In finding no merit to this assignment of error, we acknowledge that the trial court gave a self-defense instruction on Anderson's right to use reasonable force to defend himself. We find no error in the trial court's instructions to the jury regarding self-defense and the offense of felon in possession of a firearm.[6]

### III.    Sanders's Blood-Alcohol Content

---

[6] *Goodin*, 787 So. 2d at 657 (¶60).

¶40. Anderson finally argues that the trial court erred in refusing to allow the defense to introduce evidence of Sanders's blood-alcohol level at the time of his autopsy. Anderson asserts that such evidence was relevant to show Sanders's state of mind at the time of the shooting and that Anderson felt threatened by Sanders.

¶41. Generally, evidence of a victim's character is irrelevant. M.R.E. 404(a)(2). We recognize that the comment to this rule, however, states that in limited instances, the character of a victim may be relevant "where the defendant claims that the victim was the initial aggressor and that the defendant's actions were in the nature of self-defense." M.R.E. 404 cmt. In order to present this evidence, however, the defendant must offer evidence of an overt act of aggression perpetrated against him by the victim. *Id.* (citing *Freeman v. State*, 204 So. 2d 842 (Miss. 1967)). Once the act is proven, the defendant may then offer proof of the victim's character. *Id.*; *see Shinall v. State*, 199 So. 2d 251, 258 (Miss. 1967). We recognize that no matter how relevant the evidence, the trial court may exclude the evidence when unfair prejudice outweighs its probative value. M.R.E. 403. *See Rouster v. State*, 981 So. 2d 314, 320 (¶17) (Miss. Ct. App. 2007) (The trial court properly excluded evidence of the victim's intoxication by balancing its probative and prejudicial effects under Rule 403.).

¶42. Prior to the trial, the trial judge heard arguments on the State's motion to exclude Sanders's blood-alcohol level. The judge ruled that "at this point, it is not admissible," but advised that "it might become admissible during the trial as to the victim's state of mind, but it would have to be something additional offered by the defendant in order for this to become relevant."

¶43. At the close of the State's evidence, the defense asked the trial judge for an

18

opportunity to question a witness regarding whether it appeared that alcohol affected Sanders's actions and statements on the day of the shooting. The trial court explained that, generally, the character of the victim is not admissible. The trial court ultimately ruled that Sanders's blood-alcohol content at the time of his death was not relevant to the case, and found that "any prejudicial effect far outweighs any probative value, if there would be any." The trial court stated that it would, however, allow testimony from any witnesses who observed Sanders drinking, and the observations of these witnesses.

¶44. Anderson maintains that he shot Sanders in self-defense. He argues that the trial court's refusal to allow evidence of Sanders's blood-alcohol content at the time he was shot is reversible error. In support of his argument, Anderson cites to *Newell v. State*, 49 So. 3d 66, 73 (¶18) (Miss. 2010), where the supreme court found reversible error where the trial court refused to allow evidence of the deceased's toxicology report in a murder case where the defendant claimed self-defense.

¶45. We further acknowledge that precedent reflects that the supreme court has held that intoxication evidence offered for the purpose of giving rise to the victim's motive or intention, or the defendant's belief in the imminence of his danger, is admissible as long as its relevance has been established by the time the evidence is offered. *Newell*, 49 So. 3d at 73 (¶16). *See also Byrd v. State*, 154 Miss. 742, 123 So. 867, 869 (1929). In *Newell,* the defendant claimed the trial court erred improperly refused to allow evidence of the victim's toxicology results. *Newell*, 49 So. 3d at 72 (¶14). During the trial in *Newell*, the defendant attempted to cross-examine the forensic pathologist regarding the victim's blood toxicology, but the trial court excluded it. *Id*. The trial court explained that evidence of the victim's

toxicology was irrelevant because, at the time the forensic pathologist testified, no evidence had been brought forth to show any violent action or behavior by the victim. *Id*. at (¶15). The supreme court found, however, that at the time the forensic pathologist testified, the relevance of the victim's toxicology results had been established, explaining:

> The jury obviously knew that [the defendant] was on trial for fatally shooting [the victim], and it already had heard that the shooting had occurred soon after [the victim]'s allegedly aggressive and violent behavior, evidence of which had been presented through testimony by [witnesses] present at the stand-off. [So, the victim's] toxicology results were relevant to show "all the circumstances under which the fatal difficulty occurred, and which would in any manner . . . indicate the mental state of the deceased." . . . Therefore, the exclusion of [victim]'s toxicology results was an abuse of discretion, because the relevance of that evidence had been established at the time [the forensic pathologist] took the stand.

*Id*. at 73 (¶17) (internal citations omitted).

¶46.   The supreme court ultimately found that the exclusion of the toxicology evidence amounted to reversible error, stating:

> [The defendant's] theory of the case was self-defense, and evidence of [the victim's] toxicology could have affected the jury's understanding of [the victim's] motive or intention and [the defendant's] belief in the imminence of his danger. So the exclusion of the evidence prevented [the defendant] from fully presenting his theory of the case to the jury and thus adversely affected his right to a fair trial.

*Id*. at (¶18).

¶47.   In this case now before us, the State asserts that no evidence was presented at trial reflecting that Sanders had been aggressive or violent at the time of the murder, or that Sanders had ever displayed violent or aggressive behavior in the past towards Anderson or anyone else after consuming alcohol.   The State claims that the present case is distinguishable from *Newell,* because in *Newell*, when the defendant attempted to put on

20

evidence of the victim's intoxication, evidence had already been presented showing that the victim acted violently at the time of the killing. *Id*. The State argues that no evidence was presented to indicate that Sanders in any way provoked Anderson prior to the murder, and thus Sanders's state of mind was not relevant at the time Anderson sought to introduce evidence of Sanders's blood-alcohol level. *See Rouster v. State*, 981 So. 2d 314, 318-20 (¶¶10-17) (Miss. Ct. App. 2007) (victim's character not relevant at the time the evidence was offered by Rouster).

¶48.    In *Rouster*, this Court held that the proposed testimony on the victim's possible intoxication failed to constitute an exception to inadmissible character evidence for two reasons: (1) at the time the defense counsel attempted to elicit this testimony, Rouster had not claimed self-defense or established that the victim was the initial aggressor, and, thus it was irrelevant at that point in the trial, and (2) no evidence was presented that marijuana smoking is linked with a propensity for violence, either generally or regarding the victim specifically. *Id*. at 319 (¶¶15-16). In *Rouster*, this Court recognized that, regarding the victim's intoxication, modern caselaw "emphasizes not whether the victim is intoxicated, but the victim's propensity for violence at the time of the crime." *Id*. at 320 (¶17). *See Farmer v. State*, 770 So. 2d 953, 958 (¶16) (Miss. 2000) (holding it was proper to exclude testimony of victim's blood-alcohol content because relevancy not established at time introduced—testimony also excluded that would have shown victim's tendency towards violence when drunk); *Huggins v. State*, 911 So. 2d 614, 618 (¶¶ 9-12) (Miss. Ct. App. 2005) (holding it was proper to exclude testimony of victim's alcohol intoxication—no evidence provided that victim's character was to behave violently, drunk or sober).    The Court

explained that "[t]he purpose of introducing the character evidence of the victim's intoxication is to further the defendant's self-defense claim by proving the victim, who had a propensity for violence, became more violent after intoxication." *Rouster*, 981 So. 2d at 320 (¶17).

¶49. In applying the law to this assignment of error, we are mindful that the admission or exclusion of evidence by the trial court is reviewed for abuse of discretion, absent plain error. *Gilley*, 748 So. 2d at 126 (¶5). In the present case, the record shows that Anderson tried to introduce the evidence at the close of the State's case-in-chief. By this point, Coleman and Brown had provided testimony that Sanders had been drinking beer with them prior to the incident, and Coleman testified that he and Sanders entered the store with the intent to purchase more beer. Anderson testified in his own defense, and he stated that when he first encountered Sanders in the store on the night of the incident, he "thought [Sanders] was just a drunk." The record is undisputed that Sanders had consumed beer prior to going to the store to purchase more beer. The record reflects no evidence to show that Sanders became violent, or possessed a propensity for violence, when drunk.

¶50. Anderson testified that he received a blow to the head as he exited the store and that Sanders possessed a gun that fell from his hand. Without commenting on the weight or credibility of this testimony from Anderson, we acknowledge that this testimony by Anderson provides some evidence that Sanders acted as an initial aggressor, opening the door to Sanders's character for violence. *Newell*, 49 So. 3d at 73 (¶16). However, evidence in the record clearly reflects that the jury already received evidence at trial that Sanders consumed beer that evening while hanging out with Coleman and Brown, and that they went to the

22

Triple-A store to buy more beer. Hence, the jury received evidence as to Sanders's alcohol consumption prior to the shooting. As stated, no evidence presented at trial reflects Sanders possessed a propensity for violence when drinking, or that Anderson was aware of any propensity for violence by Sanders. Therefore, even if the alcohol consumption was determined to be relevant to Sanders's character or state of mind, we find no error in the trial court's exclusion of Sanders's blood-alcohol content, since the excluded evidence of blood-alcohol content was cumulative to other direct testimony from eyewitnesses as to Sanders's alcohol consumption prior to the shooting.[7] Stated otherwise, the toxicology results were cumulative to the witness testimony in the record establishing that Sanders had been drinking that evening and went to the store to get more beer. *See Weeks v. State*, 493 So. 2d 1280, 1284-85 (Miss. 1986); *see also Ross v. State*, 954 So. 2d 968, 994 (¶48) (Miss. 2007) ("Evidence may be excluded under [Rule] 403 if it is merely cumulative.").

¶51.    After our review of the record, we find no abuse of discretion in the exclusion of evidence concerning Sanders's blood-alcohol content.[8] Accordingly, we affirm Anderson's conviction and sentence.

¶52.    **THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF**

---

[7] We find no abuse of discretion in the trial court's exclusion of the blood-alcohol-content report since such evidence was cumulative to evidence presented at trial showing Sanders drank beer the evening of the shooting. However, we also acknowledge: "Errors in the admission of evidence are subject to a harmless error analysis because, as is often said, a defendant is entitled to a fair trial, not a perfect one. An error is harmless when the same result would have been reached had it not existed." *James v. State*, 124 So. 3d 693, 699 (¶18) (Miss. Ct. App. 2013) (internal citations and quotations omitted).

[8] *See Harper v. State*, 102 So. 3d 1154, 1161 (¶21) (Miss. Ct. App. 2012) ("[A]n appellate court may affirm a trial court['s decision] if the correct result is reached, even if the trial court reached the result for the wrong reasons.") (citation omitted).

**CONVICTION OF MURDER, AGGRAVATED ASSAULT, AND FELON IN POSSESSION OF A FIREARM AND SENTENCE, AS A HABITUAL OFFENDER, OF THREE LIFE SENTENCES TO BE SERVED CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED.   ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.**

**LEE, C.J., IRVING, P.J., ISHEE, ROBERTS AND FAIR, JJ., CONCUR. GRIFFIS, P.J., BARNES AND MAXWELL, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.**