# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01124-COA

**DESHAUDE JONES A/K/A DESHAUDE LAKEITH JONES**                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                             **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/09/2022 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS DESHAUDE JONES (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | ANGEL MYERS McILRATH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/04/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**McCARTY, J., FOR THE COURT:**

¶1.     DeShaude Jones was confronted by an acquaintance, Troy Taylor, in the parking lot of a bar. Jones pulled out a gun and fired multiple shots at Troy, killing him. Jones was charged with first-degree murder and felon in possession of a weapon. His indictment was later amended to charge him as a violent habitual offender. At trial, he argued he acted in self-defense, claiming Troy had previously threatened him with a gun on several occasions. A jury found Jones guilty of both charges, and the trial court found sufficient evidence proving his status as a violent habitual offender. Jones was ordered to serve two life

sentences without parole eligibility.

¶2.     Jones initially appealed through counsel, arguing the trial court erred by refusing to give a jury instruction on heat-of-passion manslaughter and a jury instruction on the defense of necessity. He subsequently filed a separate brief pro se, claiming his indictment insufficiently charged him as a habitual offender; his status as a violent habitual offender was not proven beyond a reasonable doubt; and his Sixth Amendment right to confront witnesses was violated at his sentencing. Finding no error, we affirm on all grounds.

## BACKGROUND

¶3.     Jones moved from Chicago, Illinois, to Ocean Springs, Mississippi, in 2015. As of 2018, Jones had been hanging out at his friend Hayes Butler's apartment a couple of times a week. Troy was Butler's barber and came by the apartment one day while Jones was there. The pair had a conversation about Troy's drug use in which Jones recalled telling Troy, "[T]hat['s] poison, that ain't good for you," and "that's really not a good look."

*Prior Incidents*

¶4.     Around springtime that same year, Jones was at Butler's apartment when Troy showed up. According to Jones, Troy was drunk, beat on the door, and asked one of Butler's roommates to sell him heroin. Jones said he made another remark to Troy about heroin being bad for him and recounted that Troy "immediately got offensive" and "was like, well, who the hell you think you is? You ain't better than nobody else." Jones testified that while Butler and Butler's roommate attempted to calm Troy down, " he slipped behind me" and "grabbed me in a yoke, like, around my neck." Jones said after he managed to get out of Troy's

2

chokehold, Butler and Butler's roommates kicked Troy out of their apartment. But Troy did not leave right away. Instead, Troy remained outside, "walking back and forth, throwing his hands up, [and] hitting his fist in his hands." Jones recounted how Troy "took off his shirt" and was "going off" saying, "Tell him [(Jones)] to come outside." Troy finally left after about fifteen to twenty minutes.

¶5. Troy's wife, Jasmine Taylor, testified at trial about a later incident at a Wendy's restaurant. Jasmine disclosed that Troy went to Wendy's on his lunch break one day and saw Jones in the parking lot. Troy told her that Jones had pointed a gun at him.

¶6. According to Jones's testimony, he then encountered Troy in August 2018 while attending a child's birthday party. Jones said he was sitting on a staircase smoking a cigarette while the children were playing outside. He recalled that Troy walked up and pointed a gun at him. Some of the children saw Troy with his gun and screamed, so he put the gun away and walked off. Jones then watched as Troy got in his car, made eye contact with Jones, and stared him down while speeding off.

¶7. A couple of weeks later, around Labor Day, Jones and his son were at a laundromat loading clothes into their car when Troy and another man drove up. Jones testified that Troy "put his gun, like, right on the windowsill of the car and he [was] like yeah, yeah, I told you I'll see you." Troy's passenger tapped him, urging him to leave, and he eventually sped off laughing.

¶8. According to Jones, he was at a barbershop a week later when he received "some

concerning information about Troy."[1] Jones testified that based on the information he received,

> I knew at that point it's time for me. I said I have to get some protection. I said it's that time because Troy is getting too close to my home area. . . . [A]fter I go get my hair cut, I made it up in my mind, I say I got to get me some protection.

Jones explained that he meant he wanted to buy a gun. He further explained to the jury that he wanted a gun because

> I feel like I had to. . . . [T]hose two instances where I didn't have a gun, that could have been it for me. That could have been my life and I wasn't able to protect myself or my son on either occasion and that feels – that's not a good feeling not being able to protect yourself or your son.

Jones specifically testified, "*I knew I didn't supposed to have a gun but I literally felt like I at least got to protect. I'm a man, so I feel like I have to protect myself.*" (Emphasis added).

Jones stated he "rode around Biloxi" basically "just asking around, like did anybody know where I can buy a firearm that's not – that I can just get without anybody knowing." According to Jones, he was successful and purchased a gun from a man around Labor Day. Jones testified that he immediately started carrying the gun with him on a regular basis. But Jones also admitted that he had not seen Troy again after the laundromat incident—until the night of the shooting.

*The Night of the Shooting*

¶9.    On the evening of September 15, 2018, Jones and his wife went to Kahuna's bar in Ocean Springs. At some point, Jones walked outside to talk to Anheuser Mitchell, a drug

---

[1] Jones was precluded from giving any further explanation at trial due to hearsay objections.

4

dealer nicknamed "Fresh." Fresh was sitting in his car in the parking lot behind the bar. Sometime after midnight, a confrontation between Jones and Troy occurred in Kahuna's parking lot near Fresh's car. Jones testified that when Troy "popped up" behind Fresh's car, he was surprised "because I'm not expecting him to be there. . . . Troy was the last person that I expected to see[.]"

¶10. Jones told the jury that Troy began exchanging heated words immediately, saying, "[Y]eah, Ocean Springs is small, ain't it," and "I ain't no b**ch." According to Jones, Troy "was just ranting and raving" like, "[M]an, you think because you from Chicago and this and this and that." He testified that he told Troy, "I told you, man, I'm not on that." And when asked by counsel what he meant, Jones explained, "I'm not trying to be into it with you. I'm not, like, getting into petty squabbles and doing all this back and forth, ducking and dodging you and worried about if you got a gun every time I see you." Claiming he "was trying to de-escalate the situation," Jones told the jury he held out his hand to shake with Troy, but he "smacked my hand down and right when he smacked my hand down, he swung but he didn't get a full blow because I spent back. . . ."

¶11. Fresh testified he had been sitting in his car on the phone when the altercation began but eventually got out. He told the jury he did not hear Troy threaten to harm or shoot Jones, hit him, or witness Troy pull a gun on him. He also stated that Jones was the only person he saw with a gun that night, and nothing Troy did made him think Troy would shoot Jones.

¶12. Fresh testified that he attempted to intervene and recalled telling the two to break it up and advising Troy to leave. Also, Jones later recounted Fresh "telling me, man, just leave

5

it alone."

¶13. Fresh initially told law enforcement officers that at this point, Troy "asked [Jones] what he want to do, do he want to fight or do he want to shoot him [(Troy)]." He further recounted that Jones "just told him you think I'm playing with you[?]" In contrast, Jones recalled saying to Troy, "[M]an, I'm too old to be out here fighting," and Troy responding, "[L]ike, oh, yeah? What? So what you want, to get shot?"

¶14. According to Jones, at that moment, "Fresh had his arm – he had his arm on Troy's shoulder, wrapped around Troy's shoulder, trying to calm him down." Jones recounted that "[w]hen [Troy] said did I want to go get shot, his exact movement was he reached in his waist line." Jones testified that Troy's "shirt was hanging, so he reached up under his shirt. And Fresh's exact words was, Troy don't do that. Don't do that, Troy." As for the moments that led up to him pulling out his gun, Jones testified:

> I said man, I'm not fixing to let him shoot me. I'm not fixing to let him shoot me in my back. . . . So as Fresh is telling him don't do that, all I thought about was not this time. I got my gun on me now, I can protect myself this time. So in an instant I pulled my gun.
> . . . .
>
> I don't want him to pull his before mine. That was my main thing I was thinking, I got to pull mine before his. *Because last time he beat me to the punch every time and I didn't have one on me.*
> . . . .
>
> I just knew gun. All in my mind, I know he got a gun, I got to get him before he get me.

(Emphasis added).

¶15. Fresh recounted that Jones "fired the first shot, like, kind of down at, like [Troy's]

6

legs. And he shot again and then he raised the gun up and he shot a couple of more times."

Fresh explained that when Jones pulled his gun out, "[Troy] got, like, in a – I guess *turned around* and, like, *took off, like, running away*." (Emphasis added). Several other witnesses—including a security guard from Kahuna's bar and Troy's wife Jasmine—testified that Troy attempted to run away from Jones, but Jones followed after him and continued to shoot anyway.

¶16.   Kahuna's bar's motion-activated security camera in the parking lot was triggered during the altercation between Troy and Jones and captured the shooting on surveillance video. Law enforcement officers testified that in the video, Troy can be seen going in the opposite direction of Jones. Meanwhile, Jones advanced toward Troy and continued to shoot. He fired a total of eleven bullets, striking Troy from behind four times and killing him in the parking lot. Law enforcement officers also reported that there was no gun found in Troy's possession at the scene.

¶17.   When asked by counsel why he continued to shoot at Troy, Jones admitted,

> I just knew in my mind if I don't get him, eventually he's going to get me. That was my thought. . . . I just – it was just, like, one of those, like, I wanted it to be over. . . . I'm not fixing to die right here tonight. I could have been dead on both of those prior occasions. I just said I'm not fixing to die right here tonight.

After he shot Troy, Jones said he left the scene and threw the gun in a pond.

*Procedural History*

¶18.   Jones was arrested and indicted on charges of first-degree murder for the death of Troy and felon in possession of a weapon. The State subsequently discovered that Jones had

three prior convictions in Illinois and moved to amend his indictment to enhance his sentence as a violent habitual offender. The trial court allowed the State to amend Jones's indictment, and Jones did not object or otherwise challenge his prior Illinois convictions at that time.[2] After his trial, the jury found him guilty of both charges.

¶19.   At the hearing on the habitual offender enhancement, the State submitted three judgments of convictions from Illinois into evidence. The documents contained the following information: in June 2001, Jones plead guilty to robbery and was given a four-year sentence; in July 2005, he was convicted on two counts of unlawful delivery of a controlled substance and ordered to serve two eight-year concurrent sentences; and in September 2010, he was convicted of aggravated unlawful use of a weapon and sentenced to serve six years. The State also admitted into evidence a certified movement sheet from the corrections department in Illinois, which reflected the defendant's incarceration for his prior felonies. The trial court found the evidence was sufficient and adjudicated Jones as a violent habitual offender. He was sentenced to serve two life sentences without the possibility of parole in the custody of the Mississippi Department of Corrections.

## DISCUSSION

¶20.   Through counsel, Jones raises two claims of error related to jury instructions. Specifically, he argues that he was entitled to a jury instruction on heat-of-passion manslaughter as an alternative theory of his defense to murder. He also alleges he presented

---

[2] The amended indictment listed the dates of his prior felonies as June 2001, July 2005, and September *2001*. The September date contained a scrivener's error, as the judgment of conviction showed the third prior conviction occurred in September *2010*.

sufficient evidence to receive a necessity defense instruction to cover his sole defense against the charge of possession of a weapon by a felon.

¶21. After receiving permission from this Court, Jones subsequently filed a pro se supplemental brief, asserting three additional claims for relief. *See* MRAP 28(b). All three of his pro se claims raise issues related to whether his habitual offender status was properly indicted and sufficiently proven.[3]

## I. The heat-of-passion manslaughter instruction was properly rejected.

¶22. Jones argues that the trial court erred in refusing to give the jury his requested instruction on the lesser-included offense of heat-of-passion manslaughter. Jones was charged with murder but also requested a manslaughter instruction for the jury to consider whether he had killed Troy in the "heat of passion."

¶23. "[W]e review the decision of the circuit court to refuse a lesser-included offense instruction de novo." *Davis v. State*, 380 So. 3d 937, 941 (¶10) (Miss. Ct. App. 2023). "[I]t is well settled that 'manslaughter is a lesser-included offense of murder.'" *Allen v. State*, 380 So. 3d 318, 326-27 (¶39) (Miss. Ct. App. 2024) (quoting *Anderson v. State*, 361 So. 3d 609, 614 (¶13) (Miss. 2023)). However, "the evidence must warrant an instruction on the

---

[3] After he filed his pro se supplemental brief, Jones filed an additional "Addendum to Supplemental Brief." Because the additional documents do not conform with the briefing schedule or our Rules, we do not consider them. *See* MRAP 28(b) (allowing the filing of a singular "pro se supplemental Brief of the Appellant," which "may address issues not raised by counsel, but such issues must be based on the record"). Furthermore, to the extent the document "raise[s] new issues not preserved in the principal briefs, they are procedurally barred, for as a general rule, our appellate courts 'do not consider issues raised for the first time in an appellant's reply brief.'" *Jones v. State*, 382 So. 3d 558, 566 n.2 (Miss. Ct. App. 2024) (quoting *Biegel v. Gilmer*, 329 So. 3d 431, 433-34 (¶11) (Miss. 2020)).

lesser-included offense before it can be granted." *Pierce v. State*, 107 So. 3d 1011, 1014 (¶11) (Miss. Ct. App. 2012) (quoting *Graham v. State*, 582 So. 2d 1014, 1017 (Miss. 1991)). "The court may refuse an instruction which . . . is without foundation in the evidence." *Edwards v. State*, 357 So. 3d 1120, 1128 (¶23) (Miss. Ct. App. 2022) (emphasis omitted) (quoting *Gebben v. State*, 108 So. 3d 956, 966 (¶31) (Miss. Ct. App. 2012)). "Each case must depend upon its own facts and circumstances." *DeJohnette v. State*, 385 So. 3d 1231, 1245 (¶46) (Miss. Ct. App. 2023) (quoting *Wade v. State*, 724 So. 2d 1007, 1011 (¶13) (Miss. Ct. App. 1998)).

¶24.   "The test for determining whether a manslaughter instruction based on a heat-of-passion theory is warranted is 'whether the defendant acted in the heat of passion and without malice.'" *Neese v. State*, 993 So. 2d 837, 850 (¶31) (Miss. Ct. App. 2008) (quoting *Moody v. State*, 841 So. 2d 1067, 1097 (¶98) (Miss. 2003)).

¶25.   Heat-of-passion is "a state of violent and uncontrollable rage engendered by a blow or certain other provocation given[.]" *DeJohnette*, 385 So. 3d at 1245 (¶46) (quoting *Westbrook v. State*, 29 So. 3d 828, 835 (¶26) (Miss. Ct. App. 2009)). The term entails "a state of mind marked by passion overthrowing reason." *Allen*, 380 So. 3d at 327 (¶41). This "heat-of-passion standard is not subjective." *DeJohnette*, 385 So. 3d at 1245 (¶46). Rather, "[t]he question is an objective one, being whether a reasonable person would have been so provoked." *Neese*, 993 So. 2d at 850 (¶31) (quoting *Moody*, 841 So. 2d at 1097 (¶98)).

¶26.   But simply because someone has experienced an emotional response, of any kind, does not require the instruction. Instead, "the provocation must be some act that 'usurps the

mind destroying judgment.'" *DeJohnette*, 385 So. 3d at 1245 (¶46) (quoting *Sanders v. State*, 103 So. 3d 775, 778 (¶11) (Miss. Ct. App. 2012)). Similarly, "words alone are not enough to require a heat of passion manslaughter instruction." *Cooper v. State*, 977 So. 2d 1220, 1223 (¶11) (Miss. Ct. App. 2007). Also, "physical acts like 'pushing or shoving' are 'insufficient to require the instruction[.]'" *DeJohnette*, 385 So. 3d at 1245 (¶46) (quoting *Cooper*, 977 So. 2d at 1223 (¶11)).

¶27.   For illustration, in *Allen*, the defendant was charged with shooting and killing three people. 380 So. 3d at 319-20 (¶1). The trial court gave the defendant's requested self-defense and imperfect self-defense instructions but refused to give a heat-of-passion manslaughter instruction. *Id.* at 326 (¶36). When asked if "wrestling and tussling was what caused [him] to use the gun," the defendant testified, "No. I seen the gun. That's what caused me to start shooting. . . . He pulled a gun. I was in fear for my life." *Id.* at 328 (¶44). On appeal, this Court found that the defendant "clearly admitted that he did *not* start shooting out of heat of passion provoked by being struck in the face. Rather, he claims he only shot out of fear for his life after allegedly seeing [the victim's] gun." *Id.* We held, "evidence that the defendant was in fear for his life only necessitated a self-defense instruction, not a heat-of-passion instruction." *Id.*

¶28.   As in *Allen*, Jones conceded that Troy smacking his hand or attempting to hit him did not provoke him to start firing his gun. He testified unequivocally that he shot Troy because Troy had pulled a gun on him on two or three other occasions, and Jones was not going to let that happen again. Similar to *Allen*, Jones admitted a multitude of times in his interview

with police and in his testimony at trial that he only shot his gun out of "fear" for his life after thinking that Troy's putting his hand under his shirt implied he had a gun. "[E]vidence that [Jones] was in fear for his life only necessitated a self-defense instruction, not a heat-of-passion instruction." *Allen*, 380 So. 3d at 328 (¶44).

¶29. The trial court meaningfully considered relevant precedent and refused his proposed manslaughter instruction, finding no support that the shooting had resulted from "immediate provocation" as required for heat-of-passion manslaughter. Instead, the trial court found that an imperfect self-defense instruction he requested was appropriate under the facts. Specifically, the trial judge held:

> Well, I think the imperfect self-defense covers this situation but this is a heat of passion manslaughter. The case law defines heat of passion as a state of violent and uncontrollable rage engendered by a blow or certain other provocation given which would reduce a homicide from a grade of murder to that of manslaughter.

The trial judge continued,

> Passion or anger suddenly aroused at the time by some immediate and reasonable provocation by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror. I don't think we have any of that here. What we have is self defense or imperfect self-defense. So I don't think the evidence would suffice to warrant – would support instructing the jury on heat of passion.

¶30. As the trial court concluded, the evidence showed that Jones was not acting out of violent or uncontrollable rage. Rather, he acted out of his own perceived notion of self-preservation. He was deliberate in pulling out his gun and shooting it at Troy eleven times—despite Troy attempting to run away. Under these undisputed facts, we cannot say the trial court erred by refusing this instruction.

12

¶31. Furthermore, as previously stated, the "[d]enial of a manslaughter instruction is proper where the record is clear that the decedent was killed with malice[.]" *DeJohnette*, 385 So. 3d at 1244 (¶45) (quoting *Abeyta v. State*, 137 So. 3d 305, 311 (¶12) (Miss. 2014)). "When a deadly weapon is used, as here, malice is implied." *Turner v. State*, 773 So. 2d 952, 954 (¶7) (Miss. Ct. App. 2007). For a defendant "to overcome that implication, there must be some evidence in the record from which the jury could determine that the act was not the result of malice, but a result of heat of passion." *DeJohnette*, 385 So. 3d at 1244 (¶45) (quoting *Turner*, 773 So. 2d at 954 (¶7)). "Without evidence to the contrary, a heat-of-passion jury instruction [is] unwarranted." *Id.*

¶32. Because Jones used a deadly weapon to kill Troy, there is an implication of malice. *See id.* Jones also shot Troy not once, but ***eleven*** times. We find no evidence in the record showing Jones acted out of heat-of-passion rather than his stated purpose of self-defense. *See also Westbrook*, 29 So. 3d at 836 (¶29) (holding no heat-of-passion when a defendant "arm[s] himself prior to . . . and in preparation for an encounter" at some later point in time). Therefore, we conclude that the trial court did not err by refusing to give Jones's requested lesser-included-offense instruction for heat-of-passion manslaughter.

## II. The proposed instruction on the defense of necessity was properly rejected.

¶33. Jones next argues that the trial court erred by refusing to give the defense-of-necessity instruction he requested for the charge of possession of a weapon by a felon against him.

¶34. In contrast to our specific standard of review for refusing lesser-included-offense instructions, "[i]t is well settled that jury instructions generally are within the discretion of

13

the trial court, so the standard of review for the denial of jury instructions is abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). While "[a] defendant is entitled to have jury instructions given which present his theory of the case[,] . . . this entitlement is limited[.]" *Stanfield v. State*, 269 So. 3d 1188, 1190 (¶15) (Miss. 2019) (quoting *Thomas v. State*, 249 So. 3d 331, 346 (¶49) (Miss. 2018)). The trial "court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id*. (quoting *Thomas*, 249 So. 3d at 346 (¶49)). "Instructions should be read as a whole, and if they fairly announce the law of the case, there is no error." *LeCompte v. State*, 373 So. 3d 796, 800 (¶11) (Miss. Ct. App. 2023).

¶35.    There is no dispute that Jones was a felon at the time Troy was shot. Jones admitted several times that he purchased a gun to protect himself, carried the gun around with him, and used the gun to shoot Troy. As such, there is also no dispute that Jones was a felon in possession of a firearm, which was undisputedly the specific gun used in the killing of Troy.

¶36.    Nevertheless, we recognize that necessity is an affirmative defense that may be applicable to the charge of felon in possession of a weapon. *See Taylor v. State*, 246 So. 3d 936, 937-38 (¶3) (Miss. Ct. App. 2018). "When a defendant attempts to prove an affirmative defense, such as necessity, it is his burden to prove that such circumstances exist so as to substantiate such a defense." *Smith v. State*, 208 So. 3d 1, 3 (¶9) (Miss. Ct. App. 2016) (quoting *Stodghill v. State*, 892 So. 2d 236, 239 (¶9) (Miss. 2005)).

¶37.    "The defense of necessity is 'available where the defendant *reasonably acts* out of

14

fear of *imminent* danger of death or serious bodily harm to others.'" *Davis v. State*, 18 So. 3d 842, 849 (¶19) (Miss. 2009) (emphasis added) (other quotation marks omitted) (quoting *Stodghill*, 892 So. 2d at 238 (¶8)). "To prove that he had an objective need to commit a crime excusable by the defense of necessity, a defendant must prove three essential elements: (1) the act charged was done to prevent a significant evil; (2) . . . no adequate alternative [was there]; and (3) the harm caused was not disproportionate to the harm avoided." *Stodghill*, 892 So. 2d at 238 (¶8) (citing *McMillan v. City of Jackson*, 701 So. 2d 1105, 1106-07 (Miss. 1997)).

¶38.    We previously considered and found the defense of necessity applicable to a felon in possession of a weapon charge in *Taylor v. State*, 246 So. 3d 936, 938-39 (¶7) (Miss. Ct. App. 2018). In *Taylor*, a woman was standing in a motel room waiving a gun at the defendant and threatening him. *Id*. at (¶4). The defendant grabbed at the gun, forced it out of her hand, and took possession of it from her. *Id*. He then left the motel room carrying the gun with him and boarded a nearby city bus. *Id*. He rode the bus directly to his mother's house about twenty minutes away and immediately handed the gun over to her. *Id*. This Court found the trial court abused its discretion by denying the request for a defense-of-necessity jury instruction because of the imminent threat to his personal safety and because his possession was only temporary for the purpose of ensuring the gun was secured safely. *Id*. at 939 (¶8).

¶39.    But the facts in *Taylor* are distinguishable from what happened here. There was no proof at trial that Jones obtained possession of the gun during the conflict with Troy or that

Jones was not otherwise armed ahead of the conflict. Indeed, the evidence showed that Jones did not anticipate or fear that he would encounter Troy on *the specific night* at issue. Rather, Jones was not thinking about Troy when he armed himself with a firearm on the night in question. Jones admitted, "I'm not expecting him to be there. . . . Troy was the last person that I expected to see[.]"

¶40.    The night of the shooting was weeks after Troy allegedly threatened Jones and pointed a gun at him. While a notable period of time had lapsed since Troy allegedly pointed a weapon at him, Jones continued to arm himself regularly for weeks after. Jones was "not entitled to a necessity defense" because he "pursue[d] a continued course of criminal conduct after circumstances justifying such conduct cease to exist." *Taylor*, 246 So. 3d at 938-39 (¶7) (quoting *Myers v. State*, 153 So. 3d 581, 587 (¶20) (Miss. 2014)); *see also Davis v. State*, 69 So. 3d 45, 48 (¶13) (Miss. Ct. App. 2011) (finding necessity not warranted when that the defendant "could have called the police in response to the alleged threat, but he made no attempt to do so").

¶41.    To the extent Jones conflates the principles of the defense of necessity with those of self-defense, we find his argument without merit. "The defense of necessity is distinct from raising self-defense." *Smith*, 208 So. 3d at 3 (¶9) (quoting *Anderson v. State*, 185 So. 3d 1015, 1023 (¶32) (Miss. Ct. App. 2014)). "Possession of a firearm by a convicted felon is a criminal act *void of a third party to defend against*." *Williams v. State*, 953 So. 2d 260, 263 (¶8) (Miss. Ct. App. 2006) (emphasis added). In other words, "[Jones] was guilty of possessing a firearm even if [Troy] had never approached him that night." *Id*.

16

¶42. Ultimately, we cannot say that the evidence shows Jones's possession of the gun at the time in question was out of "necessity" such that it would entitle him to a jury instruction on the defense of necessity.

### III.  Pro Se Issues

¶43. As allowed by our Rules of Appellate Procedure, Jones subsequently filed his own pro se supplemental brief. *See* MRAP 28(b). In his pro se brief, Jones argues his amended indictment insufficiently charged him as a habitual offender, the State failed to prove his status as a habitual offender beyond a reasonable doubt, and his Sixth Amendment right to confront witnesses was violated at his habitual-offender sentencing hearing.

### A.  The indictment was sufficient to charge him as a habitual offender.

¶44. Jones argues the amendment to his indictment charging him as a violent habitual offender is invalid because the third prior conviction included lists a conviction date of September "2001." He claims he was actively serving out his sentence for another crime and could not have been convicted on the date written. Jones argues that because his indictment does not include the correct date for the third prior conviction, it is defective. He claims that as a result of the defective indictment, his enhanced sentence is illegal and should be vacated.

¶45. "The purpose of an indictment is 'to inform the defendant with some measure of certainty as to the nature of the charges brought against him so that he may have a reasonable opportunity to prepare an effective defense.'" *Wilkins v. State*, 57 So. 3d 19, 25-26 (¶20) (Miss. Ct. App. 2010) (quoting *Moses v. State*, 795 So. 2d 569, 571 (¶13) (Miss. Ct. App. 2001)). The record on appeal shows Jones was afforded ample notice in the trial court of the

17

prior convictions intended to be used as proof of his habitual offender status.

¶46.    Also, Jones challenges the sufficiency of his indictment as to habitual status for the first time on appeal. "When an accused fails to object to the habitual offender issue during the sentencing phase, he is procedurally barred to do so for the first time on appeal." *Grayer v. State*, 120 So. 3d 964, 968-69 (¶14) (Miss. 2013). Nonetheless, "[r]ecognizing that his argument is procedurally barred, [Jones] contends that he has a fundamental right to be free of an illegal sentence and urges this Court to review his sentence for plain error." *Id*. We "may employ plain-error review if 'a defendant's substantive or fundamental rights are affected.'" *Conner v. State*, 138 So. 3d 143, 150-51 (¶19) (Miss. 2014) (quoting *Grayer*, 120 So. 3d at 969 (¶15)).

¶47.    In a prior case analyzing whether an indictment for habitual offender status was flawed, our Supreme Court found "that an indictment's failure to list any date for a prior conviction was not fatal to the indictment." *Benson v. State*, 551 So. 2d 188, 196 (Miss. 1989). The *Benson* Court reasoned:

> [I]nformation pertaining to the date of the judgment was substantially set forth in the indictment and that sufficient information was afforded the defendant to inform him of the specific prior convictions upon which the State relied for enhanced punishment to comply with due process.

*Id*. (internal quotation marks omitted) (quoting *Wilkins*, 57 So. 3d at 26 (¶20)).

¶48.    We later considered a defendant's claim that his indictment was defective for enhancement purposes because the date for one of his prior felony convictions was listed as June 30, 1997, but should have been May 23, 2003. *Wilkins*, 57 So. 3d at 26 (¶21). In accord with *Benson*, we concluded that "the date of June 30, 1997, was merely [a] scrivener's error

18

in drafting the indictment, which did not render the indictment defective." *Id*.

¶49. The pen pack[4] submitted to the trial court reflects three prior convictions for crimes committed in Illinois that the State of Mississippi cited in the amended indictment. On June 29, 2001, Jones was convicted of felony robbery and sentenced to serve four years in custody. On July 6, 2005, Jones was convicted of two charges of unlawful delivery of a controlled substance and ordered to serve two concurrent eight-year sentences.

¶50. It is undisputed that Jones's indictment incorrectly lists the date for the third prior conviction from Illinois presented to support his habitual offender status. A mistake was made while drafting the indictment document, but this typographical error in the indictment does not warrant reversal. Despite the typo, Jones was given sufficient information in the indictment to inform him of the specific prior conviction the State was relying on. Therefore, pursuant to *Benson* and *Wilkins*, the scrivener's error was harmless and not fatal to his indictment.

### B. The habitual offender status was proven beyond a reasonable doubt.

¶51. As his second pro se issue, Jones claims that his habitual offender status was not proven beyond a reasonable doubt. But Jones failed to object to the exhibits introduced at the time of his sentencing hearing and, instead, raises this issue for the first time on appeal.

¶52. "To sentence a defendant as a habitual offender, 'all that is required is that the accused

---

[4] "'Pen packs,' or penitentiary packages, 'are the records maintained on inmates sentenced to the custody of the Department of Corrections.'" *Edwards v. State*, 75 So. 3d 73, 75 n.1 (Miss. Ct. App. 2011) (quoting *Jasper v. State*, 858 So. 2d 149, 152 (¶11) (Miss. Ct. App. 2003)).

be properly indicted as an habitual offender, that the prosecution prove the prior offenses by competent evidence, and that the defendant be given a reasonable opportunity to challenge the prosecutor's proof.'" *Grayer*, 120 So. 3d at 969 (¶18) (quoting *Keyes v. State*, 549 So. 2d 949, 951 (Miss. 1989)).

¶53. Part of the argument takes issue with the fact that the evidence for determining whether to sentence him as a habitual offender was presented to the judge and not submitted to the jury. However, we have repeatedly held that "[w]hen the defendant is indicted as a habitual offender, 'a jury is to decide the question of guilt and subsequently the *circuit judge is to serve as the finder of fact in determining whether the habitual offender part of the indictment is established* by the requisite degree of proof." *Conner*, 138 So. 3d at 151 (¶20) (emphasis added) (quoting *Seely v. State*, 451 So. 2d 213, 215 (Miss. 1984)). Therefore, the decision was properly within the trial judge's purview.

¶54. Jones also appears to argue that the pen pack was not sufficient evidence to prove his habitual offender status and that more evidence was needed. "[P]en-pack records may constitute competent evidence." *Id*. Furthermore, "[c]ertified copies of the indictments and sentencing orders in these prior convictions were introduced into evidence at the sentencing hearing. . . . [T]hese records constitute sufficient evidence that he was a habitual offender within this statute." *Taylor v. State*, 122 So. 3d 707, 711 (¶11) (Miss. 2013) (quoting *Moore v. State*, 631 So. 2d 805, 805-06 (Miss. 1994)).

¶55. Furthermore, Jones alleges that his prior conviction for robbery in Illinois was not a crime of violence. In a previous case, this Court actually examined whether robbery is

considered a crime of violence in Illinois. *Avant v. State*, 55 So. 3d 1115, 1118-19 (¶5) (Miss. Ct. App. 2010). We specifically found that a robbery conviction was a crime of violence under Illinois law. *Id*. at (¶6).[5] Moreover, our caselaw has held that under Mississippi law, "robbery is a crime of violence for purposes of habitual-offender sentencing." *Pryor v. State*, 148 So. 3d 381, 386 (¶17) (Miss. Ct. App. 2014) (citing *Magee v. State*, 542 So. 2d 228, 236 (Miss. 1989)).[6]

¶56.   Therefore, as a whole, Jones's argument that his habitual offender status was not sufficiently proven is without merit.

### C. The right to confront witnesses does not apply at sentencing hearings.

¶57.   Jones's last claim in his pro se brief argues his Sixth Amendment right to confront

---

[5] In *Avant,* we found, "Under Illinois law, 'a person commits robbery when he or she takes property, except a motor vehicle covered by Section 18-3 or 18-4, from the person or presence of another by the use of force or by threatening the imminent use of force.' 720 Ill. Comp. Stat. 5/18-1 (West 2002)." *Avant*, 55 So. 3d at 119 n.1.

[6] The exhibits from Jones's sentencing hearing were contained in multiple different volumes and a supplement to the record, which challenged appellate review of this issue. The review was further complicated because Jones's prior convictions and sentencing orders were from a foreign jurisdiction with its own precedent and statutes.

The failure to prove habitual offender status has resulted in reversal on multiple occasions. *See Williams v. State*, 351 So. 3d 482, 487 (¶15) (Miss. Ct. App. 2022) (vacating habitual offender conviction for failure to provide evidence "of a second prior conviction and sentence"); *Porter v. State*, 379 So. 3d 942, 944 (¶10) (Miss. Ct. App. 2024) (finding that "the trial court was without authority to declare [a petitioner in a Administrative Remedy Program case] a habitual offender" when there was no proof of two predicate offenses); *Vince v. State*, 844 So. 2d 510, 516 (¶17) (Miss. Ct. App. 2003) (reversing habitual sentence when indictment failed to "include both the principal charge and a charge of previous convictions" and to "allege with particularity the nature or description of the offense constituting the previous convictions"). Due to the nature of the proof in these cases, it is imperative that the record contain the relevant and detailed proof of prior convictions in a manner that it can be reviewed on appeal.

witnesses against him was violated because he did not have the opportunity to cross-examine the author of the certified records, Illinois Department of Corrections Supervisor Sheila Brown. He contends that the certified record of the movement sheet from his three prior convictions in Illinois introduced by the State was inconsistent with the indictment and that he was deprived of the ability to question or challenge the validity of Brown's conclusions.

¶58. "The Supreme Court of the United States has held that the Confrontation Clause does not apply during the sentencing process." *Conner*, 138 So. 3d at 152 (¶26). In particular, "[t]he Mississippi Supreme Court has held that a defendant has a right to confront the witnesses against him at a sentencing hearing *before a jury*." *Wells v. State*, 328 So. 3d 124, 129 (¶8) (Miss. Ct. App. 2020). "[N]o such extension has been made to a sentencing before a trial judge;" therefore, "a defendant has no right of confrontation at a non-jury sentencing." *Id*. (quoting *Burgess v. State*, 178 So. 3d 1266, 1280 (¶42) (Miss. 2015)).

¶59. Accordingly, the Sixth Amendment right to confront witnesses did not apply at Jones's sentencing hearing when the trial judge examined the question of his habitual offender status.

## CONCLUSION

¶60. For the reasons explained above, we affirm Jones's convictions and sentences.

¶61. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., NOT PARTICIPATING.**

22